**LOWDEN et al. v. NORTHWESTERN NAT. BANK & TRUST CO. OF MINNE- APOLIS, MINN.**

No. 2789.

District Court, D. Minnesota, Fourth Division.

June 17, 1935.

O'Brien, Horn & Stringer, of St. Paul, Minn., for plaintiffs.

Cobb, Hoke, Benson, Krause & Faegre, of Minneapolis, Minn., for defendant.

NORDBYE, District Judge.

The court, having duly heard and considered the evidence and arguments of counsel, makes the following findings of fact:

I. That at and during all the times herein mentioned and referred to, the Chicago, Rock Island & Pacific Railway Company, hereinafter called the Rock Island, was and still is a consolidated corpora-

tion organized under the laws of Illinois and Iowa, respectively, and was at all times a common carrier by railroad, engaged in the transportation of persons and property in interstate and intrastate commerce in the states of Illinois, Iowa, Minnesota, South Dakota, Nebraska, Kansas, Missouri, Colorado, Arkansas, Louisiana, Oklahoma, Tennessee, and New Mexico, and was not a street, suburban, or interurban electric railway, and that during the six months immediately preceding June 7, 1933, it had had, and on said date had, its principal operating office in the city of Chicago, Ill., in the Northern District of Illinois, Eastern Division.

II. That each of the plaintiffs was at all times herein stated, and still is, a resident and citizen of the state of Illinois.

III. That the defendant was at all times herein stated, and still is, a national banking association duly organized under the laws of the United States, to wit, the so-called National Banking Act, and was at all times, and is, located and engaged in doing a general banking business in Minneapolis, Hennepin county, Minn., within the District of Minnesota, and within the Fourth Division thereof, and said defendant was, and is, a citizen of the state of Minnesota.

IV. That this cause is a suit of a civil nature wherein the matter in controversy exceeds, exclusive of interest and costs, the sum and value of $3,000, and is wholly between citizens of different states.

V. That on June 7, 1933, at 9:55 o'clock a. m., Central Standard Time, said Rock Island, desiring to effect a plan of reorganization pursuant to section 77 of chapter 8 of the Acts of Congress relating to bankruptcy (11 USCA § 205), filed with the United States District Court for the Northern District of Illinois, Eastern Division, in a certain proceeding therein pending entitled "In the Matter of The Chicago, Rock Island and Pacific Railway Company, Debtor No. 53209," its petition, a copy of which is attached to the complaint herein and marked Exhibit A (petition No. 1). Upon the filing of said petition, said court did on June 7, 1933, enter in said cause its certain order, a copy of which is attached to the complaint and marked Exhibit B (order No. 1). That each of said exhibits is hereby made a part hereof by reference.

VI. That during banking hours on June 7, 1933, said Rock Island did deposit in its said checking account with said defendant the additional sum of $14,808.44, making the total amount on deposit in its said account with the defendant at the close of business on June 7, 1933, the sum of $45,362.94.

VII. That all statements and allegations contained in Exhibit A of the complaint herein were and are in fact true; that on and ever since June 7, 1933, said Rock Island was, has been, and still is unable to meet its debts as they mature.

VIII. That for many years prior to June 7, 1933, the Rock Island had maintained, and on said date did maintain, an ordinary checking account with the defendant, the funds therein being subject to withdrawal upon proper checks or orders of the Rock Island. On June 6, 1933, at the close of business on that date, there was on deposit in said account the sum of $30,554.50.

IX. That at the close of business on June 7, 1933, the amount on deposit in said checking account with the defendant was the sum of $45,362.94.

X. That of the additional deposits made in said account on June 7, 1933, items aggregating at least $6,354.22 were made before 9:55 a. m., Central Standard Time on said day.

XI. That on June 8, 1933, the Rock Island deposited in said account an additional amount of $13,378.49; on June 9, 1933, the sum of $19,124.89; and on June 10, 1933, the sum of $11,885.30; but on said June 10, 1933, the defendant bank paid a check on said account drawn by the Rock Island, and dated June 9, 1933, in the sum of $50,000. The amount, therefore, on deposit in said account in defendant bank at the close of business on June 10, 1933, was the sum of $39,751.62.

XII. That on June 12, 1933, the Rock Island deposited in said account an additional sum of $25,624.56; on June 13, 1933, the sum of $10,068.22; and on June 14, 1933, the sum of $11,035.73; but on said June 14, 1933, the defendant bank properly charged against said account the sum of $111.23, items previously deposited but not paid on presentation. The amount, therefore, on deposit in said account at the close of business on June 14, 1933, was the sum of $86,368.90.

XIII. That on June 15, 1933, the Rock Island deposited in said account the sum of $18,048.81; and on June 16, 1933, the sum of $16,238.93; but on said June 16, 1933, the defendant bank paid from said account a check, dated June 14, 1933, drawn by said Rock Island thereon in the sum of $75,000. The amount, therefore, on deposit in said account at the close of business on June 16, 1933, was the sum of $45,656.64.

XIV. That on June 17, 1933, the Rock Island deposited in said account the sum of $15,332.34, and on June 19, 1933, the sum of $16,446.18, which would have made the amount on deposit in said account at the close of business on June 19, 1933, the sum of $77,435.16, except for the debit to said account described in the next paragraph hereof.

XV. That on said June 19, 1933, the defendant deducted from said account and debited it in the sum of $45,362.94 (the amount on deposit in said account at the close of business on June 7, 1933), making the amount on deposit in said account, according to the books of said bank at the close of business on June 19, 1933, the sum of $32,072.22. At a later date, however, on June 23, 1933, the defendant bank restored the sum of $5,611.32 of the amount so deducted and debited on June 19, 1933, by crediting said amount to said account, making the net deduction and debit therefrom the sum of $39,751.62 (the amount on deposit in said account at the close of business on June 10, 1933).

XVI. That below is a tabular statement showing the state of said account between June 6, 1933, and June 19, 1933:

| 1933 | Checks and Charges | Deposits | Balance at Close of Business |
|---|---|---|---|
| June 6 | | | $30,554.50 |
| June 7 | | $14,808.44 | 45,362.94 |
| June 8 | | 13,378.49 | |
| June 9 | | 19,124.89 | |
| June 10 | $50,000.00 | 11,885.30 | 39,751.62 |
| June 12 | | 25,624.56 | |
| June 13 | | 10,068.22 | |
| June 14 | 111.23 | 11,035.73 | 86,368.90 |
| June 15 | | 18,048.81 | |
| June 16 | 75,000.00 | 16,238.93 | 45,656.64 |
| June 17 | | 15,332.34 | |
| June 19 | | 16,446.18 | 77,435.16 |

That from this balance of June 19, 1933, the defendant deducted $45,362.94, of which it restored on June 23, 1933, $5,611.32, making the net deduction $39,751.62.

XVII. That for some time prior to June 7, 1933, the defendant had been, and on that date was, the owner of $100,000 par value unregistered first and refunding gold bonds of the Rock Island. That said bonds were all payable to bearer, were dated April 1, 1904, and were due April 1, 1934. That they bore interest at the rate of 4 per cent. per annum, payable April 1st and October 1st of each year. That such interest was evidenced by coupons attached to the principal bond. That all interest on said issue of bonds had been paid up to and including April 1, 1933, including the bonds owned by defendant. That the form of each of said bonds was that indicated on pages 3 to 5, inclusive, of the copy of the trust deed attached to plaintiffs' reply as Exhibit A, and said bonds were all secured by a trust deed or mortgage, a copy of which is attached to said plaintiffs' reply as Exhibit A. That the defendant, when it acquired said bonds, did not purchase or acquire them from the Rock Island, but bought them on the open market, $75,000 from Guaranty Company of New York, and $25,000 from National City Company of New York, the said purchases being made on or about the following dates and at the following rates per hundred dollars of par value: November 18, 1927, $25,000 at 96; July 19, 1928, $50,000 at 94¾; October 8, 1930, $25,000 at 99⅜.

That said issue of bonds was an authorized issue of $163,000,000, of which on June 7, 1933, in excess of $104,000,000 was issued and in the hands of the public. That while certain of said issue of bonds were registered, the defendant at no time owned any such registered bonds.

XVIII. That on June 7, 1933, Carl Nyquist, vice president, secretary and treasurer of the Rock Island, sent by United States mail from New York, N. Y., to defendant a letter, a copy of which is attached to the stipulation of facts herein as Exhibit 5, and made a part hereof by reference, which letter was received by defendant on June 9, 1933, and on June 10, 1933, said Nyquist mailed by United States mail from Chicago, Ill., a letter to defendant, a copy of which is attached to said stipulation as Exhibit 6, and made a part hereof by reference, with which was inclosed a copy of the court's said order of June 7, 1933, which

letter and copy of order were received by the defendant on June 12, 1933. That said letter of June 7, 1933, did not come to the notice or attention of any executive or other officer of defendant until after June 10, 1933; and said letter of June 10, 1933, with the copy of order therewith inclosed, did not come to the notice or attention of any executive or other officer of defendant until June 12, 1933.

XIX. That said check of $50,000 paid on June 10, 1933, was paid by an employee or employees of defendant as a routine matter, and without any notice or knowledge on the part of the defendant or any of its officers of the facts set forth in paragraph V of these findings, and in the payment of said check there was no intention upon the part of defendant to waive, relinquish, or abandon the said right of set-off.

XX. That said check of $75,000 came into the defendant bank on June 15, 1933; that the payee thereof was thereupon advised that said check would not be paid until additional deposits were made sufficient to cover said check without drawing into the balance on hand at the close of business on June 7, 1933; that on June 16, 1933, sufficient additional deposits were made to permit such payment of said check; that on said date payment thereof was made out of such additional deposits and concurrently 'with a letter then and there written and duly mailed by defendant to said railway company, a true and correct copy of which is attached to said stipulation of facts as Exhibit 1 and made a part hereof by reference, and which letter was received by said railway company in due course of the mails. That, in the payment of said check, there was no intention on the part of defendant to waive, relinquish, or abandon its said right of set-off.

XXI. That defendant did not intend, in the payment of either of said checks, to apply the same or any part thereof to deposits made prior to June 7, 1933, at 9:55 a. m.

XXII. That the rights and claims of defendant upon said bonds as of June 7, 1933, constituted and were provable claims against the estate of said railway company, both under the general provisions of the Bankruptcy Act, and under section 77 thereof; and that the same, and the said deposit account as of that date, constituted mutual debts and mutual credits as between the said estate and defendant.

XXIII. That each and all of the said bonds matured as of April 1, 1934, and were in default prior to the commencement of this action, no part thereof having been paid except certain payments of interest thereon.

XXIV. That upon the exercise of said right of·set-off, defendant duly offered to deliver to said railway company sufficient of said bonds in par value to equal the amount of deposit thus set off, which said railway company unconditionally refused, denying defendant's right to make such set-off.

XXV. That any right of set-off possessed by defendant bank was limited to the amount on deposit in the Rock Island account on June 7, 1933, at 9:55 a. m., the hour when the Rock Island petition was filed, said sum being $36,908.72, and plaintiffs are entitled to the return of $2,842.90, being the difference between the said sum of $36,908.72 and the sum of $39,751.62, which was debited and deducted by the defendant on June 19, 1933.

That, upon the above findings, the court makes the following conclusions of law:

1. That at all times herein mentioned and prior to June 7, 1933, defendant had a right in the nature of a possessory lien upon said deposit account; and upon the initiation of said proceedings under said section 77 of the Bankruptcy Act, a right to enforce the same by setting off the balance of said deposit account accrued against a corresponding amount of said bonds.

2. That under the facts herein found, the court has the right and duty to recognize and give effect to said right of set-off.

3. That defendant has in no way waived, relinquished, or abandoned said right.

4. That defendant is entitled to a decree establishing, recognizing, and confirming its right of set-off as against the balance in said checking account as of 9:55 a. m. on June 7, 1933, to wit, the sum of $36,908.72; and adjudging that plaintiffs have and recover of defendant the sum of $2,842.90 and no more, with lawful interest thereon from·June 7, 1933, together with their costs and disbursements herein; and that defendant, upon

further order of the court, deposit with this court for delivery to said plaintiffs a sufficient number of said bonds in par value to equal the amount of deposit thus set off, any cash difference to be determined by further order of the court upon application of either party.

Let a decree in accordance herewith be forthwith entered.

### Memorandum.

Section 77 (n) of the act, 11 USCA § 205 (n), provides: "In proceedings under this section and consistent with the provisions thereof, the jurisdiction and powers of the court, the duties of the debtor and the rights and liabilities of creditors, and of all persons with respect to the debtor and his property, shall be the same as if a voluntary petition for adjudication had been filed and a decree of adjudication had been entered on the day when the debtor's petition was filed."

Section 68 of the General Bankruptcy Act (11 USCA § 108), reads as follows:

"(a) In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid.

"(b) A set-off or counterclaim shall not be allowed in favor of any debtor of the bankrupt which (1) is not provable against the estate; or (2) was purchased by or transferred to him after the filing of the petition, or within four months before such filing, with a view to such use and with knowledge or notice that such bankrupt was insolvent, or had committed an act of bankruptcy."

█ It is earnestly urged by the plaintiffs that the equitable doctrine of set-off as set forth in section 68 is inconsistent with and contrary to the aims and general purposes of the Railway Reorganization Act; that the railway company is neither a bankrupt nor insolvent; that it merely cannot pay its debts when they mature, and is therefore seeking to reorganize under the act; that the proceeding does not contemplate a liquidation and distribution of the assets, and if the reorganization proceeding for any reason proves futile, then there will be a dismissal and the railway company will simply resume its former status with the rights of all creditors unimpaired, except

for the consequential damages that may have been sustained by reason of the delay in enforcing their demands.

The purpose of section 77 is clearly set forth in the late opinion of the Supreme Court in Continental Ill. Nat. Bk. & T. Co. v. Chicago, Rock Island & Pacific Ry. Co., 294 U. S. 648, 55 S. Ct. 595, 604, 79 L. Ed. 1110, decided April 1, 1935: "Section 77 advances another step in the direction of liberalizing the law on the subject of bankruptcies. Railway corporations had been definitely excluded from the operation of the law in 1910 (chapter 412, § 4, 36 Stat. 838, 839, 11 USCA § 22), probably because such corporations could not be liquidated in the ordinary way or by a distribution of assets. A railway is a unit; it can not be divided up and disposed of piecemeal like a stock of goods. It must be sold, if sold at all, as a unit and as a going concern. Its activities can not be halted because its continuous, uninterrupted operation is necessary in the public interest; and, for the preservation of that interest, as well as for the protection of the various private interests involved, reorganization was evidently regarded as the most feasible solution whenever the corporation had become 'insolvent or unable to meet its debts as they mature.'"

Section 68 of the General Bankruptcy Act merely enunciates a principle which has been long recognized by the courts. In discussing that section, the Supreme Court stated: "That section did not create the right of set-off, but recognized its existence, and provided a method by which it could be enforced even after bankruptcy. * * * That right is constantly exercised by business men in making book entries whereby one mutual debt is applied against another." Studley v. Boylston Bank, 229 U. S. 523, 528, 33 S. Ct. 806, 808, 57 L. Ed. 1313.

The object of the section is to allow a statement of account between a creditor and a bankrupt so as to permit the application of set-off between mutual debts and credits. It is founded upon equitable principles and recognizes the injustice under certain circumstances of a creditor being required to pay to a bankrupt's estate an indebtedness, when it appears that the creditor has, for instance, a provable debt in excess of the amount that it owes to the bankrupt. It is, of course, recognized that under this doctrine the

creditor may receive a preference to the extent of the set-off, but that fact does not militate against the soundness or applicability of the principle. "As we have seen, a deposit of money to one's credit in a bank does not operate to diminish the estate of the depositor, for when he parts with the money he creates at the same time, on the part of the bank, an obligation to pay the amount of the deposit as soon as the depositor may see fit to draw a check against it. It is not a transfer of property as a payment, pledge, mortgage, gift, or security. It is true that it creates a debt, which, if the creditor may set it off under § 68, amounts to permitting a creditor of that class to obtain more from the bankrupt's estate than creditors who are not in the same situation, and do not hold any debts of the bankrupt subject to set-off. But this does not, in our opinion, operate to enlarge the scope of the statute defining preferences so as to prevent set-off in cases coming within the terms of § 68a. If this argument were to prevail, it would, in cases of insolvency, defeat the right of set-off recognized and enforced in the law, as every creditor of the bankrupt holding a claim against the estate subject to reduction to the full amount of a debt due the bankrupt receives a preference in the fact that, to the extent of the set-off, he is paid in full." New York County Nat. Bank v. Massey, 192 U. S. 138, at page 147, 24 S. Ct. 199, 201, 48 L. Ed. 380.

Section 68 is not self-executing, but it may be exercised by a creditor upon the intervention of bankruptcy, or, in order to avoid circuity of action, it may be asserted in the event a trustee brings an action against a creditor to recover on a debt due the bankrupt's estate. The section is applied in composition proceedings under the Bankruptcy Act. See Cumberland Glass Mfg. Co. v. DeWitt, 237 U. S. 447, 35 S. Ct. 636, 59 L. Ed. 1042. It may be noted that in the Continental National Bank Case, the Supreme Court expressed the view that the proceedings under section 77 are not unlike composition proceedings. In commenting upon the constitutionality of section 77, the court stated: "As outlined by that section, a plan of reorganization, when confirmed, cannot be distinguished in principle from the composition with creditors authorized by the act of 1867, as amend-

ed by the act of 1874. It is not necessary to the validity of either that the proceeding should result in an adjudication of bankruptcy. The constitutionality of the old provision for a composition is not open to doubt. In re Reiman, 20 Fed. Cas. pages 490, 496, 497, No. 11,673, cited with approval in Hanover National Bank v. Moyses, supra [186 U. S. 181, 22 S. Ct. 857, 46 L. Ed. 1113]. That provision was there sustained upon the broad ground that the 'subject of bankruptcies' was nothing less than 'the subject of the relations between an insolvent or nonpaying or fraudulent debtor, and his creditors, extending to his and their relief.' That it was not necessary for the proceedings to be carried through in bankruptcy was held not to warrant the objection that the provision did not constitute a law on the subject of bankruptcies. The same view sustains the validity of section 77. Both contemplate an adjustment of a failing debtor's obligations; and although actual bankruptcy may not supervene in either, they are none the less laws on the subject of bankruptcies."

As a practical matter, it must be evident that the court in the present proceeding would utilize section 68 in striking an account between mutual debts and credits so as to determine the net amount in which the creditor could participate in the reorganization proceedings. If we assume that the bank in the instant case owed the railway company $5,000 for a freight charge, and the railway company was indebted to the bank on a promissory note in the sum of $10,000, and assume further that general creditors in the reorganization proceedings were to be paid 25 cents on the dollar, it seems clear that the court in charge of the proceedings, upon the request of the bank, would apply the principle of set-off and allow a claim of $5,000 in favor of the bank. Further, upon payment of the 25 per cent. dividend, such determination would be res adjudicata as to any future claim on the freight bill by the railway company after it had been restored to the possession of its property. Upon this assumed state of facts, it seems indisputably clear that there is no inherent inconsistency in the application of section 68 in proceedings under section 77. Of course, it may be true that the proceedings under section 77 may be for naught, and that the entire scheme of reorganization will be abandoned. Under such circumstances, there

would be no opportunity to effectuate a set-off under the assumed state of facts, but if there is a consummation of the reorganization proceeding, no cogent reason has been advanced for depriving the creditors of their rights under section 68.

The more difficult question is the applicability of section 68 at the time that the petition was filed, when it was entirely speculative whether or not a reorganization proceeding would be consummated. Bearing in mind, however, that section 68 is merely a restatement of a principle that is recognized as fair and equitable in striking an account between a debtor and creditor, it becomes necessary to consider the right of the bank to exercise its so-called banker's possessory lien upon the deposit by reason of the filing of the petition herein. The bonds held by the bank were not due at the time the petition was filed. The railway company had not been adjudicated a bankrupt, nor had it in so many words admitted insolvency. Under these circumstances, did the bank have the right to exercise its right of offset? It must be conceded that the bonds that were held by the bank constituted a provable debt in these reorganization proceedings within the meaning of the Bankruptcy Act. Section 77 requires that claims must be filed within the time limited by the court by the holders of such securities in order to participate in the reorganization proceedings, and if there is a failure to file a claim, or if the claim is not allowed, the claimant may not participate in any plan of reorganization. It is elementary that an adjudication in bankruptcy accelerates the maturity of an unmatured debt owing by a bankrupt, and if the Rock Island had been adjudicated a bankrupt under the general provisions of the Bankruptcy Act, then concededly the defendant bank would, under the principle of set-off, be justified in offsetting the amount on deposit against the railway bonds owned by it. It must be further recognized that if the railway company was insolvent, under such circumstances the weight of authority upholds the exercise of the right of set-off. The difficulty in determining the rights of the parties herein, however, is due somewhat to the rather anomalous status of the debtor in these proceedings. As stated before, the railway company has not specifically admitted insolvency, and has not been ad-judicated a bankrupt. But we are confronted with the unambiguous language contained in subsection (n) of section 77 to the effect that the rights and liabilities of creditors with respect to the debtor and his property shall be the same as if a voluntary petition had been filed and the debtor adjudicated a bankrupt. It is fair to assume that, in so far as it may be consonant with the general provisions of section 77, Congress intended by subsection (n) to fix the status of the parties as to their rights and liabilities with reference to liens, preferences, etc., as would have resulted in the event there had been an adjudication. Obviously, there are many rights of creditors under the Bankruptcy Act that do not arise in a reorganization proceeding, and a recognition of which would be inconsistent with the objects of section 77, but it must be also recognized that there are many rights of creditors that are necessarily preserved in proceedings under this reorganization act. For instance, the claims of creditors who have received preferences would be governed by the general provisions of the act. Claims entitled to priority would be recognized. The so-called four months' rule would apply, and, as suggested before, it is difficult to understand any inconsistency between the exercise of the right of set-off when the reorganization plan is being effected. It may be urged that, if these proceedings are dismissed, the bank would occupy a more favorable position than any other creditor by a recognition of its right to seize the deposits and apply them upon these bonds. However, it must be assumed that the debtor filed its petition in good faith. It has been approved by the court, and it is expected that some reorganization plan will be adopted. Some reorganization of the company appears inevitable in view of the huge unpaid bonded indebtedness, and if the debtor is unable to effect a plan, the act permits the creditors to propose a plan. If this court should now deny the defendant the right of set-off and require the bank to turn over this deposit to the trustees, the bank would be left in a position whereby it could never exercise its right of offset in the reorganization proceeding. It would seem that any uncertainty as to the ultimate success of any reorganization plan, or any speculation as to the necessity of the bank's utilizing the offset in the reorganization proceedings, should not be

resolved against the equities of the bank. It was the railway company that initiated these proceedings, and by reason of its petition announced that it was unable to pay its debts as they matured and saw no way of raising finances to pay its creditors.

A deposit in a bank under the circumstances herein simply creates an ordinary debt. If there is no inconsistency between the right of set-off and the provisions of section 77, and if subsection (n) is to be construed literally, it seems reasonably clear that the rights of the bank on June 7th are to be determined in the same way as if the Rock Island had been adjudicated a voluntary bankrupt. Recognizing the entire propriety of the right of offset in reorganization proceedings, and finding no other provision in section 77 that directly or by implication deprives a creditor of this right, it is difficult to escape the conclusion that upon the filing of the petition, section 77 of the Act stamped the petitioner as an adjudicated bankrupt, in so far as the rights of creditors are concerned and consistent with the other provisions of the act.

It has been suggested that the recognition of the bank's right to exercise this offset may seriously interfere with the railway company's plan of reorganization. Concededly, available cash is quite necessary in proceeding with any reorganization plan that will be a success, but this argument applies wherever there are cross-demands and cross-claims. Bills receivable constitute an important asset of any concern attempting reorganization, but it could not be successfully urged that mutual debts and credits arising out of an ordinary commercial transaction are contrary to the aims and objects of the reorganization statute so as to deprive creditors of this right. The deposit in the bank gave rise to a debt, and the court sees no reason for making a distinction between the right of offset in the instant case and an ordinary commercial transaction.

■ Defendant relies not only on section 68 in support of its right of offset, but contends that the facts averred in the petition are sufficient to sustain a finding of insolvency, even though the debtor has not sought the benefits of the act under that provision. The type of insolvency that will accelerate the maturity of an unmatured debt does not necessarily mean the application of the bankruptcy definition of insolvency. It is significant to note that the railway company's petition avers that within a month from the time that the petition was filed, the company would be faced with maturing interest considerably in excess of $2,000,000, which it could not pay, and, in addition, it would be faced with maturing bonds in a sum exceeding $140,000,000 in the spring of 1934, which it could not pay, and further stated that it was without funds to pay and discharge the aforesaid obligations and alleged that it had no means of borrowing or securing funds. The entire bond issue maturing April 1, 1934, excepting certain payments of interest, is in default and was in default when this action was commenced. Therefore, while evidence is lacking that, marshaling assets against liabilities, the railway company is insolvent, there is a strong showing of insolvency that equity should recognize in support of the defendant's set-off irrespective of the bankruptcy statute. See Intercontinental Rubber Co. v. Boston & Maine Railroad (D. C. Mass.) 245 F. 122; American Can Co. v. Erie Preserving Co. (C. C. A. 2) 171 F. 540; Knutson v. Northwestern Loan & Bldg. Ass'n, 67 Minn. 201, 69 N. W. 889, 64 Am. St. Rep. 410.

■ There is sufficient mutuality between the indebtedness on the bonds and the indebtedness to the railway company by reason of the deposit in the bank for the application of the principle of set-off. It may be admitted that the railway company did not know during the time it maintained its deposit that the bank was the owner of these bonds. But the strict interpretation of mutual debts and credits as indicated by text-writer Story, and which has been quoted in some decisions, has not been generally followed. In fact, the large majority of cases ignore the Story principle. The bonds in the instant case were a direct contract obligation of the railway company. The deposit in the bank created a debt due the railway company from the bank. It is apparent that the debts were mutual,—owing to and due in the same rights and capacities.

■ Plaintiff insists that if there was a right of set-off, it was waived or abandoned by the bank, and, in support of its position, urges the application of the "first in, first out" rule. It should be noted

that the court did not appoint any trustees when the petition was filed, and during all the times with which we are concerned the debtor was left in possession. No change was made in the bank account, nor in the authority of the officers to sign checks. It is stipulated that when the $50,000 check was paid by the bank on June 10, 1933, the bank officers were not informed of the reorganization proceedings. Hence, it cannot be concluded that there was any intentional abandonment of the so-called possessory lien. The deposits made by the railway company after the filing of the petition and prior to the payment of the $50,000 check were sufficient to pay this check in full. It is entirely reasonable to suppose that when the Rock Island was operating in a trust capacity, it withdrew the funds that it had deposited in that capacity. Presumably, upon the approval of the petition, all the funds became in a sense trust funds, not only the funds which were on deposit at the time the petition was filed, but also the subsequent deposits. However, in absence of some equity in favor of the railway company requiring the application of the "first in, first out" rule, it would seem that the court would unnecessarily resort to a fiction to deprive the bank of its well-recognized right under the law. After all, the doctrine of "first in, first out" as urged by the plaintiffs is subordinated to the equities of the situation, and equity will not adopt a strict and fixed rule when it is just as reasonable and far more equitable to apply the withdrawal of the $50,000 to the funds deposited by the railway company after the filing of its petition. A waiver is a voluntary relinquishment of a known right, and such waiver should not be read into these circumstances when it is admitted that the bank at no time knowingly or intentionally abandoned or waived its right of set-off. If the court is correct in determining that defendant had a possessory lien, no sound reason or equitable principle will support the application of the rule advocated by the plaintiffs. The rights of the railway company will be in no way prejudiced by the refusal of the court to apply the rule in question. No principle of estoppel can be invoked. When the railway company presented the $50,000 check, it in no way indicated that it desired to withdraw the funds deposited prior to June 7th. The railway company has not changed its position in any way by assuming that the doctrine of "first in, first out" would be utilized in honoring this check. It seems reasonably clear that if the bank has sustained its right to a set-off, then equity will not permit the defeat of such right by the application of an arbitrary rule. In so far as the $75,000 check is concerned, there can be no question but that the bank had definitely indicated that the honoring of that check would be with the understanding that the bank reserved its right of set-off to the funds on deposit when the petition was filed. The court has concluded, however, that the bank should be limited in its right of set-off to the funds that were on deposit at the time the petition was filed. If the rights of the parties are to be determined as of the time that the petition was filed, it does not seem to the court that the bank can be sustained in its position in asserting that the amount on deposit at the close of business should be considered as available for set-off purposes simply because the court for convenience ordered the books to be closed at the end of business hours on June 7th.

Let this memorandum be made a part of the foregoing findings of fact and conclusions of law.