LOWDEN et al. v. NORTHWESTERN NAT. BANK & TRUST CO. OF MINNEAPOLIS, MINN.

No. 10390.

Circuit Court of Appeals, Eighth Circuit.

July 27, 1936.

848

Marcus L. Bell, of Chicago, Ill., and Edward S. Stringer, of St. Paul, Minn. (Alexander E. Horn, of St. Paul, Minn., Daniel Taylor, of Chicago, Ill., Philip Stringer, of St. Paul, Minn., and W. F. Dickinson and Otis F. Glenn, both of Chicago, Ill., on the brief), for appellants.

Claude G. Krause, of Minneapolis, Minn. (Glenn S. Stiles, of Minneapolis, Minn., on the brief), for appellee.

Before SANBORN, WOODROUGH, and THOMAS, Circuit Judges.

SANBORN, Circuit Judge.

The Northwestern National Bank & Trust Company of Minneapolis, a national bank, prior to the year 1931, purchased upon the open market $100,000 face value of the first and refunding gold bonds of the Chicago, Rock Island & Pacific Railway Company. These bonds were purchased from the Guaranty Company and the National City Company, both of New York, and the dates of purchase and prices paid were as follows: November 18, 1927, $25,000, at 96; July 19, 1928, $50,000, at 94¾; October 8, 1930, $25,000, at 99⅜.

These bonds, owned by the bank, were bearer bonds and a part of an authorized issue of $163,000,000, of which, at all times here material, $104,000,000 had been issued and were in the hands of 'the public. The bonds were dated April 1, 1904, were due April 1, 1934, and bore interest at 4 per cent. per annum payable April 1st and October 1st. The bank continued to hold the bonds, and by June, 1933, they were selling at less than 30 per cent. of their par value, so that they were worth upon the market less than one-third of what the bank had originally paid for them.

The general offices of the Rock Island were in Chicago. It had had nothing to do with the purchase of these bonds by the bank, and never knew of such purchase prior to June, 1933. The Rock Island did business in Minneapolis, and had a checking account in the appellee bank which it had maintained for many years. The fact that the railroad had this checking account had no relation to the purchase of its bonds by the bank.

On June 7, 1933, the Rock Island filed a petition for reorganization under section 77 of the Bankruptcy Act (11 U.S.C. § 205)[1] in the United States District Court for the Northern District of Illinois. This petition

See, also, 298 U.S. 160, 56 S.Ct. 696, 80 L.Ed. ——.

[1] The reference is to section 77 as enacted March 3, 1933, 47 Stat. 1474, and before the amendments of August 27, 1935, 49 Stat. 911–926 (11 U.S.C.A. § 20ɔ).

disclosed obligations of approximately $2,000,000, maturing within 5 months, and $144,000,000 maturing within 10 months, and stated: "That the debtor is without funds to pay and discharge the aforesaid obligations as they mature, and on information and belief alleges that it has no means of borrowing or otherwise procuring such funds; that it is unable to meet its debts as they mature. * * *"

This petition was approved by the court the same day that it was filed. The order of approval did not appoint trustees of the estate of the debtor, but provided: "That the debtor be, and hereby it is, authorized and directed, pending further order of this Court in the premises, to run, manage, maintain, operate and keep in proper condition and repair the railroads and property of the debtor, wherever situated, whether in this state, judicial circuit, or elsewhere, and to manage and conduct its business. * * *"

On the day the petition was filed, an officer of the Rock Island sent from New York to the bank by mail a letter notifying it of the filing of the petition. This letter was received by the bank on June 9th. On June 10th there was mailed to the bank from the officers of the Rock Island in Chicago a letter inclosing a copy of the order approving the petition for reorganization, which letter was received on June 12th.

On June 7th, at the exact moment of the filing of the petition in Chicago, the Rock Island had to its credit in its checking account with the bank in Minneapolis, $36,908.72. Other deposits were made on that day, so that at the close of business the balance to the credit of the Rock Island in the bank was $45,362.94. In the course of its business, the Rock Island continued to make deposits each day thereafter, and at no time between June 7, 1933, and June 19, 1933, was the balance in its account at the bank drawn down below $36,908.72. The smallest amount standing to its credit at any time after June 7th was $39,751.62, the balance at the close of business on June 10th. On June 9th, the Rock Island had drawn a check for $50,000 against its account at the bank, and on June 10th the bank had paid it.

On June 16, 1933, the bank wrote the Rock Island in part as follows:

"Early this week, we received in the mail a letter from your company notifying us that your company had filed a petition with the United States District Court under the bankruptcy act for the purpose of effecting a reorganization of your company. The Court's order in that matter was filed on June 7th, 1933. At that time, there was on deposit by your company with us the sum of $45,362.94; at that time we also held $100,000.00 par value of your First and Refunding Bonds and $50,000 of Equipment Trust Certificates issued by your company.

"We are advised by our counsel that the filing of the petition in bankruptcy by you was sufficient to constitute an act of insolvency which gave us the right to offset the bank balance against the amount due on your obligations to us. After giving much consideration to this question, we have determined to exercise that right. We are, therefore, advising you of that fact at this time and request you not to draw checks on us which will reduce your balance with us on account of the $45,362.94 which was on deposit by you with us on June 7th."

On June 19, 1933, to effectuate this intention to set off the $45,362.94 against the bonds of the Rock Island, the bank debited the Rock Island account to that extent, and credited the amount against the Rock Island bonds owned by it. On June 23, 1933, the bank restored to the checking account of the Rock Island $5,611.32 of this debit, making the net deduction for the purpose of set-off, $39,751.62. This was the amount standing to the credit of the Rock Island at the close of business on June 10, 1933, and, as before stated, the smallest credit balance in its checking account at any time between June 7 and June 19, 1933.

The bank tendered to the Rock Island bonds equal in face value to the $39,751.62. This tender was refused, and the act of the bank in making the set-off was protested by the railroad.

On June 19, 1933, the Rock Island bonds held by the bank had not matured and were not in default as to either principal or interest.

On November 22, 1933, the court in which the petition for reorganization had been filed appointed trustees for the estate of the Rock Island. Thereafter, they commenced an action at law in the United States District Court for the District of Minnesota to recover from the bank the amount which it had set off against the bonds. By the time this action was commenced, the bonds of the Rock Island here involved had matured and were in default. The bank answered; alleged that on June 7, 1933, when the petition was filed, the Rock Island was insolvent; and asserted the legality of the

850

set-off of June 19, 1933. In their reply the trustees denied that the railroad was then or thereafter insolvent, and denied the legality of the set-off made by the bank. The case, on motion of the bank, was transferred to equity and tried as a suit in equity. The facts were virtually all stipulated. There was, however, evidence introduced which tended to show that prior to June 7, 1933, the Rock Island had no knowledge of the ownership of the bonds by the bank; and there was also evidence introduced to the effect that prior to about June 12th, no notice of the Rock Island's petition for reorganization came to the attention of any executive officer of the bank.

The court below, after careful consideration, reached the conclusion that the bank could properly set off against its Rock Island bonds $36,908.72, the credit balance of the Rock Island in the bank at the time the petition for reorganization was filed. (D. C.) 11 F.Supp. 929. Findings of fact, conclusions of law, and a decree were accordingly entered, from which this appeal is taken by the trustees.

Before considering the questions of law involved, it may be well to appraise the practical aspects of the situation presented. The trustees and the bank each claim superior equities. On June 6, 1933, the bank owned $100,000 of the bonds of the Rock Island, which it had purchased for an investment and which then had a market value of less than $30,000, and were not due until April 1, 1934. There had been up to that time no reason to believe that anything had occurred or would occur to accelerate the maturity of the bonds. It is not unreasonable to suppose that, upon the books of the bank, these bonds were carried at their market value. While they constituted the promise of the Rock Island to pay the par value on April 1, 1934, they did not represent loans made by the bank to the railroad. They were secured by a trust deed. By appropriating approximately $37,000 of what it owed the Rock Island because of the deposits in the bank, the bank paid to itself $37,000 of these bonds which it owned; and still had left $63,000 face value of such bonds. In other words, by taking advantage of the situation arising from the filing of the petition for reorganization by the Rock Island as a basis for set-off, the bank disposed of 37 of its bonds, worth perhaps $10,000, for $37,000, and had left 63 bonds worth, upon the same basis, about $17,000.

From the standpoint of the Rock Island, the practical situation appears to have been about this: Its checking account in the bank represented current receipts derived from operations and intended to be used in the conduct of its business as a common carrier. The account had no relation to the funded indebtedness of the railroad in the sense that it represented money being accumulated to apply upon bonds, either matured or unmatured. The Rock Island had no reason to suppose that the bank intended to appropriate and apply its bank balance upon any of its bonds which the bank might own, and there was no understanding between the bank and the railroad which required the railroad to maintain a checking account as additional security for any bonds which the bank might own or acquire. There was in fact no relationship between the ownership of the bonds by the bank and the maintaining of the checking account in the bank by the railroad. Possibly these considerations may have no controlling effect upon the legal rights of the parties, but they are of interest because of the claim of the bank that it would be most inequitable to compel it to credit the trustees with the $36,908.72 of which it deprived the railroad, and thus force it to occupy the position of other holders of similar bonds who were not fortunate enough to be debtors of the Rock Island and had no funds belonging to it to apply upon their bonds.

So far as equitable considerations are concerned, we think the bank and the railroad stand upon a substantial parity. The bank made an investment in bonds which did not turn out well. The railroad fell upon evil days which it did not anticipate and was not prepared for, and which perhaps it could not reasonably have foreseen and provided against. We think that it is the interests of all the creditors of the Rock Island which are entitled to the greatest consideration in the balancing of equities. The bank should have exactly what the law entitles it to have, and no more.

At the time this case was tried in the court below, the parties had stipulated as follows: "The sole ultimate issue in this case is the right of defendant to make said deduction [$39,751.62]. Defendant had no specific or express authority from the Rock Island to make it. Both the Rock Island and these plaintiffs [the trustees] have always protested against it, and have never acquiesced therein, and have demanded that said amount be restored to said account, but such demand has been refused. If the defendant had no right to make such deduction, plaintiffs should have judgment as

prayed for, but if, on the contrary, the defendant had the right to make such deduction, judgment herein should be for the defendant."

According to the strict letter of this stipulation, since the court held that the bank had no right to make the deduction of $39,751.62, which it did make, the decree should have been for the plaintiffs; but it was plainly not the intention of the parties to deprive the bank of any part of the set-off which was valid, and the trustees make no such claim; so that the question really was whether the bank had the right to deduct $39,751.62, or any part of it.

The main contentions of the trustees upon the trial were: (1) That there was on July 19, 1933, no credit in the account of the Rock Island with the bank which could be applied upon the bonds (a) because the $36,908.52 credit in the checking account at the time the petition was filed had been withdrawn on June 10, 1933, when the bank cashed the $50,000 check; and (b) because the credit of the Rock Island in the checking account and its debt to the bank represented by the bonds were not mutual debts and credits. (2) That if there was a credit of the Rock Island on the books of the bank at the time the set-off was made, the bank, under the law, had no right to apply such credit upon these unmatured bonds.

In deciding this case, we have certain advantages which the court below did not have. At the time the case was tried, the opinion of the Second Circuit in In re Hotel Martin Co. of Utica (First Citizens Bank & Trust Co..of Utica v. Martin et al.), 83 F.(2d) 231, upon the applicability of the "first in, first out" rule, had not been filed; and we now have the opinion of the Supreme Court in Lowden et al. v. Northwestern Nat. Bank & Trust Co.,[1] 56 S.Ct. 696, 80 L.Ed. ——, opinion filed April 27, 1936, dismissing the certificate whereby we endeavored to obtain a ruling of that court on certain of the questions raised on this appeal. The trial judge was of the opinion that the "first in, first out" rule should not be applied in this case for several reasons: (1) There was no knowledge on the part of the bank's officers at the time the $50,000 check was paid that the Rock Island had filed its petition for reorganization. (2) The deposits made by the Rock Island in its trust capacity, after petition filed, were sufficient to pay this check without having recourse to the $36,908.52, which was on deposit at the time of the filing of

[1] 298 U.S. 160.

the petition, and it was reasonable to suppose that the $50,000 check withdrew trust funds rather than the credit existing prior to the establishment of the trust. (3) A court will not resort to the "first in, first out" rule, which is arbitrary and a legal fiction, to work an injustice and to deprive a bank of the right of set-off which it would have were it not for the rule. ·

That there is a "first in, first out" rule is conceded. That it is not applied under all circumstances is also conceded. Like most other rules of law, it has its exceptions.

In 48 Corpis Juris, page 657, § 111, the text-writer says: "Subject to some limitations the general rule is that, in the case of a running account, where there are various items of debt on one side and various items of credit on the other occurring at different times, and no special appropriation of payments has been made by either party, the successive. payments are to be applied in discharge of the items of debit antecedently due, in the order of time in which they stand in the account. In other words, each item of payment is applied in extinguishment of the earliest items of debt until the payment is exhausted."

In United States v. Kirkpatrick et al., 9 Wheat. 720, 737, 6 L.Ed. 199, the Supreme Court said: "The general doctrine is, that the debtor has a right, if he pleases, to make the appropriation of payments; if he omits it, the creditor may make it; if both omit it, the law will apply the payments, according to its own notions of justice. It is certainly too late for either party to claim a right to make an appropriation after the controversy has arisen, and a fortiori, at the time of the trial. In cases like the present, of long and running accounts, where debits and credits are perpetually occurring, and no balances are otherwise adjudged than for the mere purpose of making rests, we are of opinion, that payments ought to be applied to extinguish the debts according to the priority of time; so that the credits are to be deemed payments pro tanto of the debts antecedently due."

The rule is well stated by the Supreme Court of Minnesota in Hersey et al. v. Bennett et al., 28 Minn. 86, 9 N.W. 590, 41 Am. Rep. 271; and in Lyon County v. First Nat. Bank of Balaton et al., 166 Minn. 109, 207 N.W. 138, 140, as follows: "Where there is an open current account, the items of which do not form a distinct debt, but are blended together in one account, so that

only the general balance is considered due, payments not appropriated by either party to a particular item will be applied by the court according to priority of time, or, as sometimes expressed, 'there being no special facts to interfere * * * the first money in is the first money out.' "

See, also, West Kentucky Coal Co. v. Dillman (C.C.A.8) 15 F.(2d) 25, 27, 28; Empire State Surety Co. v. Carroll County et al. (C.C.A.) 194 F. 593; In re Walter J. Schmidt & Co. (D.C.N.Y.) 298 F. 314.

It has generally been held that, under this rule, checks drawn on a bank account are to be applied against the earliest deposits. Board of Com'rs of Redwood County v. Citizens' Bank of Redwood Falls et al., 67 Minn. 236, 69 N.W. 912; First National Bank of Minneapolis v. McNairy, 122 Minn. 215, 142 N.W. 139, Ann.Cas.1914D, 977; Lyon County v. First Nat. Bank of Balaton et al., supra, 166 Minn. 109, 207 N.W. 138; First Nat. Bank of Stewart v. Hollinsworth, 78 Iowa, 575, 43 N.W. 536, 6 L.R.A. 92; Schoonover v. Osborne et al., 108 Iowa, 453, 79 N.W. 263; Maryland Casualty Co. v. Board of Water Commissioners of City of Dunkirk et al. (C.C.A.2) 66 F.(2d) 730; Parrish et al. v. Haynes (C.C.A.5) 62 F.(2d) 105; Reed v. Barnett Nat. Bank of Jacksonville (C.C.A.5) 250 F. 983.

The rule is not applied where its application will produce results clearly unjust and inequitable.

In Korbly v. Springfield Institution for Savings, 245 U.S. 330, at pages 335, 336, 38 S.Ct. 88, 91, 62 L.Ed. 326, a case involving the question whether certain payments made by trustees for savings banks which were stockholders of an insolvent national bank, to a receiver of the national bank were intended to be applied to the stockholder's liability of the savings banks, the court said:

"Since no clearly definite expression is found in the record either that these payments were or were not to be applied on the shareholding liability of the savings banks, we are required to decide which contention of the parties is the more reasonable and probable, having regard to all the facts and circumstances, stipulated and proved in the case.

"There being no evidence to the contrary, we must adopt the assumption of ordinary life and of law that the trustees for the savings banks acted lawfully, within the limits of their powers, and we must also have regard to the long-settled rule of law that where neither the debtor nor the creditor has applied payments before controversy has arisen, the courts will make application of them in a manner to accomplish the ends of justice. United States v. Kirkpatrick, 9 Wheat. 720, 6 L.Ed. 199; National Bank v. Mechanics' Bank, 94 U.S. 437, 439, 24 L.Ed. 176."

In Carson et al. v. Federal Reserve Bank of New York, 254 N.Y. 218, 172 N.E. 475, 480, 70 A.L.R. 435, Judge, now Mr. Justice, Cardozo, said: "We have no thought to suggest that this or any other formula as to the application of payments to the items of an account is of such inflexible validity as to admit of no exceptions. Whatever rule is framed will be subordinated to the broader principle that an application, usually appropriate, may be varied by the court when variance is necessary to promote the ends of justice. Korbly v. Springfield Inst. for Savings, 245 U.S. 330, 38 S.Ct. 88, 62 L.Ed. 326; Lichtenstein v. Grossman Const. Corporation, 248 N.Y. 390, 162 N.E. 292; In re Hallett's Estate, 13.Ch.Div. 696; Cunningham v. Brown, 265 U.S. 1, 12, 13, 44 S.Ct. 424, 68 L.Ed. 873."

The bank here contends that on June 7, 1933, due to the filing by the Rock Island of its petition for reorganization, it possessed a valuable right of set-off in the nature of a possessory lien upon the credit balance of the Rock Island; that there would be a strong presumption against an intention on its part to waive its right of set-off, citing Clark v. Dye, 158 Minn. 217, 226, 197 N.W. 209; Rader v. Star Mill & Elevator Co. et al. (C.C.A.8) 258 F. 599, 606; Updike et al. v. Oakland Motor Car Co. (C.C.A.2) 53 F.(2d) 369, 373; and that the existence of this presumption, plus the equities in favor of the bank, would prevent the application of the "first in, first out" rule.

Either there was or there was not in existence on June 10th, after the payment of the $50,000 check by the bank, the credit which the Rock Island had upon the books of the bank on June 7th, at the time the petition for reorganization was filed. Immediately upon the filing of the petition, the then balance in the bank account became a trust asset. The only respect in which that credit differed from any credits resulting from subsequent deposits was that if the bank then had a right to use it for the purpose of set-off, that credit continued to be subject to that right while it remained in the bank. There was no segregation of this credit from other credit items in the account; it was as much subject to withdraw-

al by the Rock Island as any other subsequent deposit. There was nothing inequitable or unfair about the drawing of the check for $50,000 by the Rock Island. It had on June 7th notified the bank of its petition, which was a matter of public record and of public interest; the Rock Island had no reason to assume that the reorganization of a great railway system with large terminals in the city of Minneapolis was of so little consequence that the executive officers of a large national bank of that city would remain for three days ignorant of the filing of the petition for reorganization. The record does not in fact show that they were ignorant of it. It merely shows that an assistant cashier testified that this $50,000 check was paid "before any officer of the Bank had received notice of these bankruptcy proceedings." This assistant cashier could testify to what he knew; possibly he could testify as to whether the written notices sent through the mails by the Rock Island had been delivered to the officers of the bank, if he had personal knowledge of that fact, but he could not and did not testify as to what other officers of the bank knew or did not know with respect to the filing of this petition. No other executive officer of the bank testified to any lack of knowledge, and it was not stipulated that the executive officers of the bank were without knowledge of the petition. However, we do not regard that question as important. There is nothing to indicate that the "first in, first out" rule depends upon knowledge or intent. Its basis is not waiver or estoppel. It is merely a rule of law which determines the ordinary application of payments or withdrawals when the parties have made no determination for themselves and circumstances do not require a different application.

Under facts very similar to those in the case at bar, the Second Circuit has recently held that the "first in, first out" rule applies. In re Hotel Martin Co. of Utica (First Citizens Bank & Trust Co. of Utica v. Martin et al.), supra, 83 F.(2d) 231. There the debtor had $9,799.02 in the bank on June 6, 1935, the day a petition for reorganization under section 77B of the Bankruptcy Act (11 U.S.C. § 207 [11 U.S.C.A. § 207]) was filed. Before June 19th, which was prior to the approval of the petition, this was increased to $27,898.81 total deposits. Withdrawals during that period were $9,823.99, leaving a balance of $18,074.82 to the debtor's credit. The bank claimed the right to apply the entire balance against

notes of the debtor which came due July 6th and July 8th, about a month after the filing of the petition. The court, after stating that the main question was whether a bank can set off debts owed to it by a corporation against a deposit made by the debtor after the filing, but before the approval, of a petition for reorganization under section 77B, said, on page 232 of 83 F.(2d): "Applying the 'first in, first out' rule (National Park Bank v. Seaboard Bank, 114 N.Y. 28, 20 N.E. 632, 11 Am.St.Rep. 612; 48 C.J. p. 659, § 111), it is apparent that all the money in the account at June 20th was deposited after the filing of the petition. In situations exactly similar, except that the petition was filed in bankruptcy, banks have been summarily ordered to turn the money over to the bankrupt's estate. Reed v. Barnett Nat. Bank, 250 F. 983 (C.C.A.5); Toof v. City Nat. Bank of Paducah, 206 F. 250 (C.C.A.6); In re Michaelis & Lindeman, 196 F. 718 (D.C.S.D.N.Y.)."

We are of the opinion that there are no reasons sufficient to justify a refusal to apply the "first in, first out" rule in this case. Therefore, on June 19, 1933, at the time the bank attempted to make the set-off, there were no credits of the Rock Island available to it for that purpose.

But, even if the "first in, first out" rule was not applicable, as the court below held, we would still be of the opinion that the bank was not entitled to make this set-off.

The bank and the trial court treated the filing of the petition for reorganization as the exact equivalent of a voluntary petition in bankruptcy. The right of a bank to set off a bank account against obligations of a bankrupt to it, under proper circumstances, is well settled. New York County National Bank v. Massey, 192 U.S. 138, 24 S.Ct. 199, 48 L.Ed. 380; Studley v. Boylston Nat. Bank, 229 U.S. 523, 528, 33 S.Ct. 806, 57 L.Ed. 1313.

Section 68a of the Bankruptcy Act (11 U.S.C. § 108 (a), 11 U.S.C.A. § 108 (a) provides: "In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid."

Paragraph (n) of section 77 of the Bankruptcy Act, 47 Stat. 1481, as it read at all times here involved (11 U.S.C. § 205), provides: "In proceedings under this section and consistent with the provisions

thereof, the jurisdiction and powers of the court, the duties of the debtor and the rights and liabilities of creditors, and of all persons with respect to the debtor and his property, shall be the same as if a voluntary petition for adjudication had been filed and a decree of adjudication had been entered on the day when the debtor's petition was filed."

The court below held: "A deposit in a bank under the circumstances herein simply creates an ordinary debt. If there is no inconsistency between the right of set-off and the provisions of section 77, and if subsection (n) is to be construed literally, it seems reasonably clear that the rights of the bank on June 7th are to be determined in the same way as if the Rock Island had been adjudicated a voluntary bankrupt. Recognizing the entire propriety of the right of offset in reorganization proceedings, and finding no other provision in section 77 that directly or by implication deprives a creditor of this right, it is difficult to escape the conclusion that upon the filing of the petition, section 77 of the Act stamped the petitioner as an adjudicated bankrupt, in so far as the rights of creditors are concerned and consistent with the other provisions of the act."

In discussing our certificate in Lowden et al. v. Northwestern Nat. Bank & Trust Co., supra, 298 U.S. 160, 56 S.Ct. 696, 698, 80 L.Ed. ——, Mr. Justice Cardozo, speaking for the Supreme Court, said:

"A proceeding to reorganize is not a bankruptcy, though an amendment to the bankruptcy act creates and regulates the remedy. From the fact without more that such a proceeding has been initiated, one cannot know that it will be necessary to have recourse to section 68, 11 U.S.C.A. § 108, which was meant in its enactment to prescribe the rule of set-off upon a distribution of the assets. That stage of administration, or the analogous stage of a revision of the debts, may never be attained in a proceeding to reorganize, though a petition has been approved and trustees have been appointed. If a plan of reorganization is not proposed or accepted, or, being proposed and accepted, is not confirmed by the court within a reasonable time, the whole proceeding may be dismissed (section 77 (c) (7), 47 Stat. 1476); the title to the estate thus reverting to the debtor. By that time there may even be ability to pay demands as they mature. What is done at the beginning amounts to

little more than a provisional sequestration to give protection for the future.

"The right of set-off must fit itself to these procedural conditions. It is not susceptible of definition in the abstract without reference to the time or occasion of the controversy or the relation of the suit to the primary proceeding. Irrespective of the acceptance or confirmation of a plan, the trustees must have the power to gather in the assets and keep the business going. To exercise that power, they may find it necessary to sue, and the suit may turn upon the right of set-off, as it does in the case at hand. In a suit for such a purpose, a suit collateral to the main proceeding and initiated at a time when the outcome of that proceeding is still unknown and unknowable, section 68 of the statute does not control the disposition of the controversy ex proprio vigore. It governs, if at all, by indirection and analogy according to the circumstances. The rule to be accepted for the purpose of such a suit is that enforced by courts of equity, which differs from the rule in bankruptcy chiefly in its greater flexibility, the rule in bankruptcy being framed in adaptation to standardized conditions, and that in equity varying with the needs of the occasion, though remaining constant, like the statute, in the absence of deflecting forces. Scott v. Armstrong, 146 U.S. 499, 507, 13 S.Ct. 148, 36 L.Ed. 1059; North Chicago Rolling Mill Co. v. St. Louis Ore & Steel Co., 152 U.S. 596, 615, 14 S.Ct. 710, 38 L. Ed. 565; Scammon v. Kimball, 92 U.S. 362, 366, 23 L.Ed. 483; Sawyer v. Hoag, 17 Wall. 610, 622, 21 L.Ed. 731; Clark Bros. & Co. v. Pou (C.C.A.) 20 F.(2d) 74, 77, 78; Greene v. Darling (Story, J.), 5 Mason, 201, 210, Fed.Cas.No.5,765; Gray v. Rollo, 18 Wall. 629, 632, 21 L.Ed. 927; Dade v. Irwin's Executor, 2 How. 383, 390, 391, 11 L. Ed. 308; Studley v. Boylston National Bank, 229 U.S. 523, 528, 529, 33 S.Ct. 806, 57 L.Ed. 1313; Pond v. Harwood, 139 N.Y. 111, 119, 34 N.E. 768; Frank v. Mercantile National Bank, 182 N.Y. 264, 268, 74 N.E. 841, 108 Am.St.Rep. 805; Lockwood v. Beckwith, 6 Mich. 168, 175, 72 Am.Dec. 69; Story, Equity Jurisprudence (14th Ed.) §§ 1871, 1872. * * *

"To know 'the justice of the particular case' (Scott v. Armstrong, supra; Story, Equity Jurisprudence, supra), one must know the case in its particulars. More concretely, one must know the value of the assets, the temporary or permanent character of the debtor's inability to pay its debts as

they mature, the liens, if there are any, superior to the bonds in controversy, the probability of an understanding that the bonds, though unmatured, would be used to cancel the deposits, all the circumstances, in brief, that might affect the judgment of the chancellor in weighing the competing equities of the interested factions and shaping his decree accordingly. We have no thought at this time to foreshadow the result of an exploring expedition directed to those ends. When all the facts are known, they may be found to offer no excuse for a departure from the rule in bankruptcy which, as indicated already, is generally, even if not always, the rule in equity as well. They may point, on the other hand, to the need for an exception, or may even lead to a decree in the nature of a compromise, the moneys being paid into the registry of the court to abide its future action. A decision balancing the equities must await the exposure of a concrete situation with all its qualifying incidents."

From this opinion of the Supreme Court we gather that the mere filing of the petition for reorganization by the Rock Island, which in no sense constituted an admission of insolvency, gave to the bank no right of set-off, and that, for that purpose, it could not regard the petition, under the circumstances, as the equivalent of a voluntary petition in bankruptcy. For the purpose of set-off, it would not be consistent with the provisions of section 77 to treat a debtor in reorganization proceedings as a voluntary bankrupt unless it appeared that insolvency actually existed and that liquidation and distribution of assets, rather than reorganization and rehabilitation, was in order.

■ We also conclude that in a suit such as this by trustees to recover funds of the debtor's estate claimed to have been set off against unmatured obligations, the rules relating to the equitable right of set-off are to be applied, and that unless the person in possession of such trust funds shall in some way make it appear, upon the trial, that the set-off was justified, the trustees are entitled to recover the funds. There was no "exploring expedition" in this case. The bank asserted the insolvency of the Rock Island. The trustees denied it. There is no way of determining from the record what its financial condition was at the time the

petition was filed, at the time of the trial, or at any other time. We know from the petition that a large amount of indebtedness was maturing, that the Rock Island could not meet it as it matured, and that it was apparently without credit. The bank now insists that the burden of conducting the exploration into the Rock Island's financial wilderness is upon the railroad. The bank, however, took the Rock Island's bank balance, which was a trust asset unless the right of set-off was established. The burden of establishing that right was clearly upon the bank, which asserted the validity of the set-off. There would be no justification for casting upon the trustees the burden of disproving the right of the bank to take this asset, unless the bank established at least a prima facie right to apply it upon the bonds.

■ The bank makes the further contention at this time that, even if it had no right to make this set-off when it did make it, a court of equity will not now require it to return the money because, at the time of the trial, the bonds of the Rock Island had matured and were then in default. It seems to us that the complete answer to that contention is that the money or credit which the bank took over was subject to no right of set-off unless it existed on June 7, 1933. If there was then no such right, the credit became a trust asset like all other trust assets, and the fact that the bank thereafter improperly retained the credit would not justify the court below in allowing a set-off at the time of trial, since that would be permitting the trust funds to be applied upon bonds of the debtor, owned by the bank, without any sanction of the court charged with the administration of the debtor's estate. There was no mutuality of debts and credits existing after June 7, 1933, and there could, we think, be no posthumous right of set-off in such a case as this.

Because of the conclusion which we have reached with respect to the "first in, first out" rule and as to the nonexistence of the right of set-off at the time the petition for reorganization was filed, we have found it unnecessary to consider other questions.

The decree is reversed, and the case remanded, with directions to enter a decree in favor of the plaintiffs for the full amount sued for, with interest and costs.