Alvin SKINNER, and all others similarly situated

v.

W. T. GRANT COMPANY.

Laurence A. DANKO

v.

W. T. GRANT COMPANY.

Civ. A. Nos. 73–3257, 74–3473.

United States District Court, E. D. Louisiana.

April 12, 1979.

On Motion for Certification Aug. 2, 1979.

Patrick D. Breeden, John M. Holahan, New Orleans, La., for plaintiffs.

Harry S. Hardin, III, Keith A. Rodriguez, New Orleans, La., for defendant.

## ORDER AND REASONS FOR RULING

CHARLES SCHWARTZ, Jr., District Judge.

This matter is before the Court solely on defendant Federal Financial Corporation's motion to dismiss for failure to state a claim under Rule 12(b)(6), or in the alternative, for summary judgment pursuant to Rule 56, and plaintiffs' opposition memorandum, pending receipt of further memoranda from counsel on the issue of set-offs under the federal bankruptcy law and further factual information as to whether Federal Financial Corporation is presently charging and collecting interest on the coupon accounts which are part of the accounts receivable that were transferred from the W. T. Grant Company trustee in bankruptcy and the contracts that are the underlying transactions of plaintiff Skinner's claims.[1] Having received same and having carefully considered the oral and written arguments of counsel, the record and the law, the Court rules as follows:

On December 12, 1973 plaintiff Alvin Skinner filed suit for penalties and damages against W. T. Grant Company ("Grant") alleging a violation of the Consumer Credit Protection Act § 302 *et seq.*, 15 U.S.C. § 1601 *et seq.* ("Truth in Lending Act"), Regulation "Z" effective July 1, 1969, 12 C.F.R. § 226.1 *et seq.* ("Regulation Z"), promulgated by the Federal Reserve Board pursuant to Consumer Credit Protection

---

1. The affidavit dated August 28, 1978 of Woodrow P. McLane, vice president of operations for Federal Financial Corporation, ("FFC") affirms that since December 2, 1976, the date of the bill of sale for the customer accounts receivable, "FFC has not charged any additional interest in the form of a finance charge on either plaintiffs' coupon accounts or coupon accounts of the purported plaintiff class which plaintiffs have defined to include the New Orleans Metropolitan area. Furthermore, because no additional interest has been charged by FFC on said accounts since December 2, 1976, no additional interest has been collected by FFC." Thus, FFC itself has not collected any funds pursuant to the allegedly illegal clauses in the contracts underlying the accounts.

Act § 105, 15 U.S.C. § 1604, La.Rev.Stat. Ann. § 9:3501 (West 1951),[2] and La.Civ.Code Ann. art. 2924 (West 1952);[3] on April 3, 1974 plaintiff Laurence A. Danko filed a complaint against Grant solely alleging Truth-in-Lending violations.

Plaintiffs' claims are based on alleged violations of the lending laws by Grant in connection with Grant's offer and extension of credit to customers in the ordinary course of its business for which a finance charge could be imposed. Plaintiff Skinner brought suit on the retail installment credit contract signed on December 12, 1972 for the purchase of some coupon books and miscellaneous merchandise, which on December 22, 1972 was extended to the credit purchase of a washing machine. Plaintiff, who was charged both a finance charge on the purchases and a "late" or "default" charge, argues that defendant W. T. Grant failed to make the necessary Truth-in-Lending disclosures and made deceptive disclosures relative to late charges or default charges. Plaintiff also alleges that the actual rate of interest charged was usurious,

and included a class action allegation on behalf of all the class who were charged and received actual damage from the usurious rate of interest.

On October 2, 1975 Grant filed a petition for arrangement under Chapter 11, section 322 of the Bankruptcy Act, 11 U.S.C. § 722, and Bankruptcy Rule 11–6, 11 U.S.C. Rule 11–6, in the United States District Court for the Southern District of New York. By order of the Bankruptcy Court for the Southern District of New York dated April 13, 1976, Grant was adjudicated a bankrupt. On April 13, 1976 Charles D. Rodman was qualified as trustee of the bankrupt estate of Grant and since that date has acted in that capacity.

On October 18, 1976, after the bankruptcy adjudication of Grant, Trustee Rodman and Federal Financial Corporation ("FFC"), a Minnesota corporation incorporated on October 13, 1976, entered into a purchase agreement for the sale of the customer accounts receivable of Grant for $44 million.

**2.** La.Rev.Stat.Ann. § 9:3501 (West 1951) reads:

Any contract for the payment of interest in excess of that authorized by law shall result in the forfeiture of the entire interest so contracted.

**3.** La.Civ.Code Ann. art. 2924 (West 1952) reads:

Interest is either legal or conventional. Legal interest is fixed at the following rates, to wit:

At seven percent on all sums which are the object of a judicial demand. Whence this is called judicial interest;

And on sums discounted at banks at the rate established by their charters.

The amount of the conventional interest cannot exceed eight percent. The same must be fixed in writing; testimonial proof of it is not admitted in any case.

Except in the cases herein provided, if any persons shall pay on any contract a higher rate of interest than the above, as discount or otherwise, the same may be sued for and recovered within two years from the time of such payment.

The owner or discounter of any note or bond or other written evidence of debt for the payment of money, payable to order of bearer or by assignment, shall have the right to claim and recover the full amount of such note, bond or other written evidence of debt and all interest not beyond eight percent per annum interest that may accrue thereon, not-

withstanding that the rate of interest or discount at which the same may be or may have been discounted has been beyond the rate of eight percent per annum interest or discount; but this provision shall not apply to the banking institutions of this state in operation under existing laws or to the consumer credit transaction as defined by the Louisiana Consumer Credit Law.

The owner of any promissory note, bond or other written evidence of debt for the payment of money to order of bearer or transferable by assignment shall have the right to collect the whole amount of such promissory note, bond or other written evidence of debt for the payment of money, notwithstanding such promissory note, bond or other written evidence of debt for the payment of money may include a greater rate of interest or discount than eight percent per annum; provided such obligation shall not bear more than eight percent per annum after maturity until paid; but this provision shall not apply to a consumer credit transaction as defined by the Louisiana Consumer Credit Law. Provided however where usury is a defense to a suit on a promissory note or other contract of similar character, that it is permissible for the defendant to show said usury whether same was given by way of discount or otherwise, by any competent evidence.

The customer accounts receivable which were the subjects of the sale are described in section 1.1(a), (b) of the Purchase Agreement.[4] This original agreement was amended by written agreement on November 17, 1976. The sale was authorized on November 17, 1976, by order of Judge John J. Galgay, the bankruptcy judge in the Grant Proceedings, providing for the sale of the accounts receivable "free and clear of all liens, security interests and encumbrances (including without limitation, any liens, security interests or encumbrances in respect of taxes, priority claims, creditors' claims and claims of governmental agencies)." This order was later amended on November 26, 1979 to provide further that

*Federal's purchase of the aforesaid property shall not constitute an assumption by Federal of any liability or any obligation of the Trustee (including, without limitation, any liability or obligation in respect of any outstanding net credit balance or any litigation pending against the Bank-*

*rupt or the Trustee),* provided, however, that (a) the aggregate outstanding balance of each Receivable shall be subject to certain reductions as provided in the Purchase Agreement, without recourse to the Trustee, and (b) any net credit balance due to any Receivable debtors remain the responsibility of the bankrupt estate.

(Emphasis added.) The crucial provision regarding the assumption of liabilities by FFC through the purchase of the accounts receivable from the trustee is contained in section 1.7 of the Purchase Agreement.[5]

The bill of sale between Trustee Rodman and FFC conveying the accounts receivable was executed on December 2, 1976. It, like the amended purchase agreement and the order of November 17, 1976, recited that in consideration of the purchase price, the sale of the Grant customer accounts receivable is made "free and clear of all liens, security interests and encumbrances." [6]

4. Section 1.1(a), (b) of the purchase agreement executed between the Trustee and FFC reads:

*Purchased Assets.* Upon all the terms and subject to all the conditions set forth hereinbelow, the Purchaser agrees to purchase and acquire from the Trustee, and the Trustee agrees to sell, assign, transfer and convey to the Purchaser, free and clear of all liens, security interests and encumbrances (including, without limitation, any liens, security interests or encumbrances in respect of taxes, priority claims, creditors' claims and claims of government agencies), all the Trustee's right, title and interest in and to the following (the "Purchased Assets"):

(a) all the receivables of the Trustee, as of the close of business on July 26, 1976, representing accounts receivable due from customers of the Bankrupt (including, without limitation, customer accounts receivable in respect of which the customers were employees of the Bankrupt), but only to the extent that such receivables remain uncollected immediately prior to the Closing referred to hereinbelow (all the foregoing uncollected receivables of the Trustee being referred to hereinbelow as the "Receivables");

(b) all funds which, on the date of the Closing referred to hereinbelow (the "Closing Date"), are held by, or due or to become due to the Trustee from, any third party or parties engaged by the Trustee or the Bankrupt in connection with the collection of the receivables  . . . . .

5. Section 1.7 of the purchase agreement reads:

*No Assumption of Liabilities.* The Purchaser, in acquiring the Purchased Assets pursuant to this Agreement, is not assuming any liability or any obligation of the Trustee (including, without limitation, any liability or obligation in respect of any outstanding net credit balance or any litigation pending against the Bankrupt or the Trustee), *provided, however,* that it is expressly understood and agreed that (a) the aggregate outstanding balance of each Receivable shall be subject to reduction, without recourse to the Trustee (except as otherwise expressly provided in this Agreement), by (i) the aggregate amount of all outstanding credit balances due to any person who is a debtor in respect of such Receivable, and (ii) every other defense, offset, or counterclaim of any of such persons (whether or not heretofore asserted in any litigation pending against the Bankrupt or the Trustee), and (b) any net credit balance due to any such debtors shall be and remain the responsibility of the Trustee.

6. The Bill of Sale conveyed the accounts to FFC and its successors and assigns:

free and clear of all liens, security interests and encumbrances (including, without limitation, any liens, security interests or encumbrances in respect of taxes, priority claims, creditors' claims and claims of government agencies), all the Trustee's right, title and interest in and to the following (the "Purchased Assets"):

On January 23, 1976 plaintiffs Skinner and Danko filed proofs of claim in the amount of $400,000.00 in the Grant bankruptcy proceeding. Plaintiff Skinner filed an amended proof of claim in the amount of $2,000,000.00 dated April 6, 1976; plaintiff Danko filed an amended proof of claim in the amount of $2,000,000.00 on April 8, 1976. On July 29, 1976 plaintiffs filed a second proof of claim in the Grant bankruptcy proceedings in the amount of $2,000,000.00.

With regard to the complaints filed against Grant which are before this Court, plaintiffs filed amended complaints on October 17, 1977, adding FFC as a defendant and alleging liability of FFC as a voluntary assignee under section 115 of the Consumer Protection Act, 15 U.S.C. § 1614 (1970 & Supp. IV 1974) for the Truth-in-Lending violations of Grant in the credit contracts and as a voluntary assignee under state law of the claims arising under state law.

At no time did plaintiffs Danko and Skinner challenge directly the jurisdiction of the Bankruptcy Court over the accounts receivable or its order authorizing the sale of these accounts.

Plaintiff's claim that defendant FFC is liable under 15 U.S.C. § 1614 as the subsequent assignee of Grant for the alleged Truth-in-Lending violations on the customer accounts receivable is within the jurisdiction of this Court under 15 U.S.C. 1640(e). Additionally, plaintiff Skinner's claims under La.Rev.Stat.Ann. § 9:3501 (West 1951) and La.Civ.Code Ann. art. 2924 (West 1952) are alleged to arise out of the same transactions, and therefore are within the pendent jurisdiction of this Court.

Section 115 of the Consumer Credit Protection Act, provides for a qualified immunity under the act for assignees of an original creditor's accounts tainted with alleged violations of Truth in Lending:

> (a) all the receivables of the Trustee, as of the close of business on July 26, 1976, representing accounts receivable due from former customers of the Bankrupt (including, without limitation, customer accounts receivable in respect of which the customers were em-

Except as otherwise specifically provided in this subchapter, any civil action for a violation of this subchapter which may be brought against the original creditor in any credit transaction may be maintained against any subsequent assignee of the original creditor where the violation from which the alleged liability arose is apparent on the face of the instrument *unless the assignment is involuntary.*

15 U.S.C. § 1614 (1970 & Supp. IV 1974) (emphasis added). FFC asserts that section 115 of the Act shields it from any of Grant's alleged Truth-in-Lending violations on the customer accounts receivable since it contends that both the original transfer of the accounts from the alleged bankrupt to the trustee pursuant to section 70(a) of the Bankruptcy Act, 11 U.S.C. § 110(a), and the court-approved sale of the accounts by the trustee were "involuntary assignments." Plaintiffs, on the other hand, argue that the initial transference was not involuntary and secondly that notwithstanding the language of section 115, when a purchase agreement from the trustee provides, in part, for set-offs on the accounts, the language in the agreement should be given effect and provide for set-offs of the allegedly illegally retained monies and the remaining debit balance. Thus, this Court must consider the twin prongs of the characterization of the transferred Grant customer accounts receivable, *i. e.,* whether the accounts receivable transferred to the trustee and then purchased by FFC pursuant to the sale agreement with the trustee were "involuntary assignments" under 15 U.S.C. § 1614. Secondly, the Court must consider whether the set-off provisions of Louisiana law and/or section 68 of the Bankruptcy Act, 11 U.S.C. § 108, tainted the accounts receivable with liability for the alleged Truth-in-Lending and state law usury violations (a position which is advocated by plaintiffs) notwithstanding the express terms of the

> ployees of the Bankrupt), but only to the extent that such receivables remain uncollected immediately prior to the execution and delivery of this Bill of Sale (all the foregoing receivables of the Trustee being referred to hereinbelow as the "Receivables") . . . . .

purchase agreement, order and amended order of sale, and bill of sale. Finally, a determination must be made as to whether FFC *voluntarily* assumed any possible *past* Truth-in-Lending or state law usury liability on the accounts.

## I. *Involuntary Assignments under 15 U.S.C. § 1614*

The limited case law construing section 115 of the Act[7] gives this Court little guidance in determining whether the initial transfer to the trustee or the trustee's sale are *per se* "involuntary assignments" within the meaning of that section. Yet, in reviewing the case law and the policies of the Act and the Bankruptcy Act, it is clear that the answer to both of these questions is in the affirmative.

Judicial sales have traditionally been classed as involuntary assignments, *see Hoffeld v. United States,* 186 U.S. 273, 276, 22 S.Ct. 927, 46 L.Ed. 1160 (1902), and it is well settled that a sale by a trustee in bankruptcy is a judicial sale, *see, e. g., J.J. Sugarman Co. v. Davis,* 203 F.2d 931 (10th Cir. 1953). By analogy, such a sale by a trustee renders the assignee of the property an assignee by operation of law, *i. e.,* pursuant to the power granted the bankruptcy court by the Bankruptcy Act. *See* 6A C.J.S. *Assignments for Benefit of Creditors* § 4. The federal Anti-Assignment statutes have construed the transfer of the bankrupt's property to the trustee as involuntary assignments for the purposes of 31 U.S.C. § 203. *Erwin v. United States,* 97 U.S. 392, 397, 24 L.Ed. 1065 (1898), *cited in Price v. Forrest,* 173 U.S. 410, 19 S.Ct. 434, 437, 43 L.Ed. 749 (1899); *see also Segal v. Rochelle,* 382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966); *Danielson v. United States,* 416 F.2d 408 (9th Cir. 1969). It

should be noted in this latter regard, however, that the cases decided under the Anti-Assignment statute classed the trustee as an involuntary assignee, but did not reach the issue of the involuntary character of the transfer from the trustee to a subsequent purchaser. Yet to hold that the transfer from the bankrupt to the trustee is an involuntary assignment and that the transfer from the trustee to the subsequent purchaser (which is also made pursuant to bankruptcy court order) is *not* an involuntary assignment would be inconsistent with the settled law that property held by the court and sold pursuant to a judicial sale is an involuntary assignment under federal common law. Moreover, it would also be inconsistent with the power of the court under the Bankruptcy Act to sell assets free of encumbrances and to grant such title which is analogous, in part, to that granted by judicial sale. 4A Collier, Bankruptcy ¶ 70.99[8].

The *Manual* promulgated under Regulation Z to interpret the Truth in Lending Act specifically refers to an assignment in bankruptcy as an involuntary assignment, although it is arguable whether it refers both to the initial assignment to the trustee and to the assignment to the subsequent purchaser. *See Board of Governors' Examiners' Manual on Regulation Z and Truth-In-Lending Act,* in 2 R. Clontz, Truth-in-Lending Manual App. C–3, at C–234–35 (4th ed. 1976). The *Manual,* as a formal act of the Board under Regulation Z, ought to be followed as long as the "regulation promulgated thereunder . . . is 'reasonably related to the purposes of the enabling legislation.'" *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 1661, 36 L.Ed.2d 318 (1973). Clearly, the better reading of section 1614

---

7. To date only seven courts have considered section 115 of the Act. *See Milhollin v. Ford Motor Credit Co.,* 588 F.2d 753, 756 n. 9 (5th Cir. 1978); *Price v. Franklin Investment Co., Inc.,* 187 U.S.App.D.C. 383, 391 n. 15, 574 F.2d 594, 602 n. 15 (D.C.Cir. 1978); *Rachbach v. Cogswell,* 547 F.2d 502, 505 (10th Cir. 1977); *Murphy v. Beneficial Finance Co. of Central Ohio,* 443 F.Supp. 463, 471 n. 10 (S.D.Ohio 1976); *Cenance v. Bohn Ford, Inc.,* 430 F.Supp.

1064, 1069 (E.D.La.1977); *Williams v. Bill Watson Ford, Inc.,* 423 F.Supp. 345, 352–53 (E.D. La.1976); *Copley v. Rona Enterprises, Inc.,* 423 F.Supp. 979, 984 n. 6 (S.D.Ohio 1976). Neither of the two cases which have construed the impact of section 115 on a credit transaction, *Cenance v. Bohn Ford, Inc., supra* and *Williams v. Bill Watson Ford, Inc., supra,* dealt with the issue presented before this Court.

and the interpretative *Manual* would be to include the subsequent transferee of the trustee as an involuntary assignee. Here there is no attempt to evade the prescriptions of the Truth in Lending Act through the purchase of the accounts receivable from a trustee in bankruptcy as is present under the sham subsequent assignment cases that have been decided under section 1614. *See, e. g., Meyers v. Clearview Dodge Sales, Inc.,* 539 F.2d 511 (5th Cir. 1976); *Desselles v. Mossy Motors, Inc.,* 442 F.Supp. 897 (E.D.La.1978) (Sear, J.); *Cenance v. Bohn Ford, Inc.,* 430 F.Supp. 1064, 1069 (E.D.La.1977) (Rubin, J.). Moreover, the staff interpretive letters construing the Truth in Lending Act support such a construction.[8]

Pretermitting a consideration of the actual purchase agreement and order of sale consummating the transaction, for this Court not to hold that the judicial sale by the trustee was an *involuntary assignment,* and that the trustee himself received the accounts receivable by *involuntary assignment,* would undermine a court's power in bankruptcy to sell assets free and clear of all claims, liens, and encumbrances, *see Van Huffel v. Harkelrode,* 284 U.S. 225, 52 S.Ct. 115, 76 L.Ed. 256 (1931) (such power is "granted by implication"); 4B Collier, Bankruptcy ¶ 70.97[2] n.15, and thereby transfer the claims, liens, and encumbrances on the property to the proceeds from the sale (here the $44 million paid for the customer accounts receivable), *see Monroe County Bank of East Stroudsburg v. Dreher,* 88 F.2d 288, 289 (3d Cir. 1937); 4B Collier, Bankruptcy ¶¶ 70.99[8] n.71, 70.99[3] n.13. For this Court to allow such a claim against FFC would be in essence to allow a collateral attack on the order authorizing the sale issued by the bankruptcy court for the Southern District of New York, an order which, by judicial construction, has been held conclusive and immune from *collateral* attack by any party to the proceedings. *See Chicot County Drainage District v. Baxter State Bank,* 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940); *Stoll v. Gottlieb,* 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104 (1938); 2 Collier, Bankruptcy ¶ 21.29[2].

II. *Assumption of Grant's Past Truth-in-Lending and State Law Usury Liability under State Law and/or Section 68 of the Bankruptcy Act*

■ The gravamen of plaintiffs' statutory argument is that the Grant customer accounts receivable have been burdened with a set-off against the balances owed by the "debt" which Grant contracted for with these customers in the confection of the underlying consumer credit contracts due to the alleged Truth-in-Lending and state law usury liability in an amount to be computed under section 406(a) of the Act, 15 U.S.C. § 1640(a)[9] and La.Civ.Code Ann. art. 2924,[10]

---

8. The interpretive letter reads in pertinent part:

The term "involuntary assignment" in section 115 does not have any specific meaning differing from that of its ordinary use in law. Generally, involuntary assignments comprehend transfers made solely by operation of law, or by an assignor under legal compulsion. For instance, insolvency and bankruptcy laws compelling an insolvent debtor to surrender his property to an assignee or trustee to be administered under the direction of the court for the benefit of creditors and compelling the creditor to release the debtor are instances of involuntary assignments. *See,* 6A C.J.S. Assignments for Benefit of Creditors § 4 (1975); 6 Am.Jur.2d Assignments for Benefit of Creditors § 3 (1963). On the other hand, assignments pursuant to agreements which were voluntarily entered into will not be considered involuntary, although the law may require the faithful execution of such agreements.

[1977] Consumer Credit Guide ¶ 31,700.

9. Section 406(a) of the Act reads:
(a) Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under this part or part D or E of this subchapter with respect to any person is liable to such person in an amount equal to the sum of—
(1) any actual damage sustained by such person as a result of the failure;
(2)(A)(i) in the case of an individual action twice the amount of any finance charge in connection with the transaction, or (ii) in the case of an individual action relating to a consumer lease under part E of this subchapter, 25 per centum of the total amount of monthly payments under the lease, except that the liability under this subparagraph shall not be less than $100 nor greater than $1000; or
(B) in the case of a class action, such amount as the court may allow, except that as to

respectively, and that once the customer accounts receivable have been so "tainted" by a set-off, a subsequent sale by the trustee pursuant to bankruptcy court order does not "cleanse" the accounts in the hands of the transferee. In furtherance of this position, plaintiffs cite articles 2207 and 2208 of the Louisiana Civil Code and section 68 of the Bankruptcy Act, 11 U.S.C. § 108. Article 2207 provides that:

> When two persons are indebted to each other, there takes place between them a compensation that extinguishes both the debts, in the manner and cases hereafter expressed.

La.Civ.Code Ann. art. 2207 (West 1952). Moreover, article 2208 provides that:

> Compensation takes place of course by the mere operation of law, even unknown to the debtors; the two debts are reciprocally extinguished, *as soon as they exist simultaneously,* to the amount of their respective sums.

La.Civ.Code Ann. art. 2208 (West 1952). Section 68 of the Bankruptcy Act, which governs set-offs and counterclaims in bankruptcy, provides that:

> a. *In all cases of a mutual debts or mutual credits between the estate of a bankrupt and a creditor* the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid.

b. A set-off or counterclaim shall not be allowed in favor of any debtor of the bankrupt which (1) is not provable against *the estate* and allowable under subdivision g of section [57] of this [Act]; or (2) was purchased by or transferred to him after the filing of the petition or within four months before such filing, with a view to such use and with knowledge or notice that such bankrupt was insolvent or had committed an act of bankruptcy.

11 U.S.C. § 108 (emphasis added).

Under the Louisiana civil code articles, a setoff arising by operation of law occurs solely if both debts are *simultaneously liquidated.* [11] Plaintiffs' claims, to this date, are not liquidated since there has been no adjudication of liability for any violations in the confection of the consumer credit contracts; thus, the "debts" allegedly owed by FFC as the transferee of Grant are not presently, nor have they been, liquidated. Under section 68(a) of the Bankruptcy Act, the right to set off arises if there are "mutual debts or mutual credits," *Cumberland Glass Mfg. Co. v. DeWitt,* 237 U.S. 447, 35 S.Ct. 636, 639–40, 59 L.Ed. 1042 (1914); however, neither is "[a] set-off under § 68 . . . automatic or self-executing." 4 Collier, Bankruptcy ¶ 68.02[1], at 850 (citing *id.*);

---

each member of the class no minimum recovery shall be applicable, and the total recovery in such action shall not be more than the lesser of $500,000 or 1 per centum of the net worth of the creditor; and

(3) in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court.

In determining the amount of award in any class action, the court shall consider, among other relevant factors, the amount of any actual damages awarded, the frequency and persistence of failures of compliance by the creditor, the resources of the creditor, the number of persons adversely affected, and the extent to which the creditor's failure of compliance was intentional.

15 U.S.C. § 1640(a) (1970 & Supp. IV 1974).

**10.** *See* note 3 *supra.*

**11.** Setoffs and compensation under the civil code articles only arise by operation of law if

both debts are liquidated. As stated by the court in *Beyer Transportation Co. v. Whiteman Contracting Co.,* 187 So. 143 (La.App.Orl.1939):

> Our attention is directed to Arts. 2207, 2208 of the Civil Code, which, it is true, provide for this compensation and provide further that it takes place automatically; and it is settled that, where this compensation does take place, it does so by operation of law, and that a claim which might otherwise be prescribed can, nevertheless, be availed of as an offset if, at the time the two debts became due, both were liquidated and demandable and neither had prescribed. [Citations omitted.]

187 So. at 144; *accord, Brock v. Natalbany Lumber Co.,* 179 So. 322, 324 (La.App. 1st Cir. 1938) (art. 2207); *People's Bank in Liquidation v. Mississippi & Lafourche Drainage Dist.,* 141 La. 1009, 1015, 76 So. 179, 182 (La.1917) (art. 2208).

*see also Lowden v. Northwestern Nat'l Bank & Trust Co.,* 11 F.Supp. 929, 933–34 (D.Minn.1935), *rev'd on other grounds,* 84 F.2d 847 (8th Cir.), *cert. denied,* 299 U.S. 583, 57 S.Ct. 109, 81 L.Ed. 430 (1936). Under section 68, set-offs arising out of state law are recognized and allowed, *see Stanolind Oil & Gas Co. v. Logan,* 92 F.2d 28, 32 (5th Cir.), *cert. denied,* 302 U.S. 763, 58 S.Ct. 409, 82 L.Ed. 592 (1937); *Lehigh Valley Coal Sales Co. v. Maguire,* 251 F. 581 (7th Cir. 1918). By the express terms of section 68(a), set-offs attach not to the property which is the subject matter of the claim from which the alleged right of set-off arises, but exist between the set-off creditor and the bankrupt's estate. 11 U.S.C. § 108(a). Moreover, "a bankruptcy court, or any other court exercising equity jurisdiction, can look to the circumstances of the particular case in determining whether an asserted setoff should be allowed, notwithstanding the nature of the claim is within § 68. To this extent the Bankruptcy Act provision is regarded as permissive rather than mandatory." 3 H. Remington, Bankruptcy § 1434, at 373 (J. Henderson ed. 1957) (citing *Stanolind Oil & Gas Co. v. Logan, supra* ); *accord,* 4 Collier, Bankruptcy ¶ 68.02[1], at 851–52, & cases cited at nn.14–16.

Assuming, *arguendo,* that under Louisiana and federal Truth-in-Lending law, plaintiffs have claims which could be the subjects of a set-off, the set-off would be accomplished by filing proofs of claim under sections 57(c), (d) of the Bankruptcy Act, 11 U.S.C. §§ 93(c), (d),[12] and by filing

suit against the trustee if so authorized by the bankruptcy court. No set-off or counterclaim would be allowed in favor of "any debtor of the bankrupt which (1) is not provable against the estate and allowable under subdivision g of [§ 57] of this act." 11 U.S.C. § 108(b)(1); 4 Collier, Bankruptcy ¶ 68.04[1], at 861. The crucial factor is that the rights under section 68 attach not to the particular assets from which the claims are derived, but to the bankrupt's estate, which would include the proceeds from the sale, if any, of those assets. *See* 4 Collier, Bankruptcy ¶ 68.04[2.1], at 868. Even assuming that the right of set-off did exist against the assets themselves, in this case the "tainted" accounts receivable, absent an *express* and *unequivocal* assumption of past liability under the Purchase Agreement, this Court would deny recovery in the form of a set-off or offset against the accounts for Truth-in-Lending violations under the statutory authority of section 115 of the Consumer Credit Protection Act, 15 U.S.C. § 1614, and, pursuant to the exercise of its equity jurisdiction, would also deny recovery against FFC as the transferee of the accounts for the alleged state law usury violations since the Court is of the opinion that it would be inequitable and unfair to burden the subsequent transferee with penalty liability on the accounts for past collections of usurious interest under the original consumer credit contracts when FFC, the assignee of those contracts, is not itself presently collecting interest on the accounts which would be usurious under Louisiana law.[13]

---

**12.** Sections 57(c), (d) of the Bankruptcy Act, 11 U.S.C. §§ 93(c), (d), reads:

c. Proofs of claim may, for the purpose of allowance be filed by the claimants in the court of bankruptcy where the proceedings are pending or before the release if the case has been referred.

d. Claims which have been duly proved shall be allowed upon receipt by or upon presentation to the court, unless objection to their allowance shall be made by parties in interest or unless their consideration be continued for cause by the court upon its own motion: *Provided, however,* That an unliquidated or contingent claim shall not be allowed unless liquidated or the amount there-

of estimated in the manner and within the time directed by the court; and such claim shall not be allowed if the court shall determine that it is not capable of liquidation or of reasonable estimation, or that such liquidation or estimation would unduly delay the administration of the estate or any proceeding under this Act.

*See also* section 63(d) of the Bankruptcy Act, 11 U.S.C. § 103(d) ("Where any contingent or unliquidated claim has been proved, but, as provided in subdivision (d) of section [57] of this act, has not been allowed, such claim shall not be deemed provable under this act").

**13.** *See* note 1 *supra.*

III. *Assumption of Grant's Past Truth-in-Lending and State Law Usury Liability under the Purchase Agreement and Sale as Authorized by Bankruptcy Court Order*

■ The crux of plaintiffs' argument in this regard is the contention that a reading of section 1.7 of the Purchase Agreement, which provides that any receivable "shall be subject to reduction by (i) the aggregate amount of all outstanding credit balances due to any person who is a debtor in respect of such Receivable and (ii) every other defense, *offset,* or counterclaim of any such person . . . (emphasis added)" compels a finding that FFC *voluntarily assumed* the Grant Truth-in-Lending liability and/or liability for interest overcharges under state law. Therefore, the question becomes whether the language of section 1.7 of the Purchase Agreement,[14] the order [15] and amended order [16] of sale, as well as the bill of sale,[17] supports a construction that the trustee sold and FFC acquired Grant's statutory liability on the accounts, a statutory liability which had previously been asserted in the bankruptcy proceedings as proofs of claim against Grant's estate.

The language of the Purchase Agreement and the court orders, although broad in scope, was cryptic with regard to FFC's liability for the over twenty-five individual and class claims similar to the ones pending before this Court which have been filed against the consumer credit contracts underlying the Grant customer accounts receivable. A synopsis of these claims was attached to the Purchase Agreement as Schedule *V.* However, a construction of the language of the Purchase Agreement which is consistent with the language in the order and amended order of sale compels the conclusion that FFC only assumed *presently liquidated* claims against the customer accounts receivable. Pursuant to its power to sell the assets of the bankrupt free and clear of all claims, liens, and encumbrances, and to transfer the provable liens properly filed to the proceeds from the sale of the assets, Judge Galgay recited in the November 17, 1976 order that the proceeds from the sale of the Grant accounts receivable would be encumbered by the proofs of claim which had been filed in the bankruptcy proceeding. The language in the amended order signed by the referee strengthens the argument that provable claims and pending litigation would be *the sole responsibility of the bankrupt estate,* and that any net credit balance owing to the receivable debtors would remain its responsibility. Since the Purchase Agreement is only given validity pursuant to order of court, its terms must be construed consistent with such court orders and as effectuating the policies of that Act, specifically the power of the bankruptcy court to sell encumbered property free of all valid claims, liens, and encumbrances, provided that the court has actual or constructive possession of the property involved. 4B Collier, Bankruptcy ¶ 70.99[1].[18]

14. *See* note 5 *supra.*

15. *See* pp. 487–488 *supra.*

16. *Id.*

17. *See* note 6 *supra.*

18. Section 1.8 of the Purchase Agreement reads:

*Adjustment of the Purchase Price.* Following the Closing, the Trustee shall maintain in a separate account $1,000,000 of the Purchase Price, which may be invested and reinvested by the Trustee in his sole discretion and shall be held or disposed of as follows:

(a) All interest earned in respect of the money deposited in such separate account may be withdrawn and used by the Trustee, free from any restrictions imposed by this Agreement.

(b) Unless the Purchaser shall have delivered to the Trustee, within fifteen days following the second anniversary of the Closing Date (the "Second Anniversary Date"), the written notice and Adjustment Claim referred to in Paragraph 1.7(c) of this Agreement the Trustee shall cease to be required to maintain such separate account, any amount therein may be withdrawn and used by the Trustee free from any restrictions imposed by this Agreement, and there shall be no adjustment of the Purchase Price.

(c) If, within fifteen days following the Second Anniversary Date, the Purchaser shall have delivered to the Trustee (i) a written notice that (A) on the Second Anniversary Date an injunction was in effect barring the collection by the Purchaser of any Receivable as a result of any lawsuit, action or

Plaintiffs' argument seeks to avoid this result by a strained interpretation of the Purchase Agreement, specifically section 1.7. As noted above, the only interpretation of the agreement consistent with the actual orders issued and the policies of the Bankruptcy Act would be to construe the references to offsets as referring to presently liquidated, not unliquidated, claims against the accounts which had not been previously asserted against Grant's estate in the bankruptcy proceeding. Plaintiffs filed proofs of claim in the Grant bankruptcy, and thereby subjected their claims to the summary jurisdiction of that court. Although a party need not formally object to the summary jurisdiction of the court in bankruptcy, see *Airmotive Suppliers, Inc. v. Tavormina,* 519 F.2d 1102 (5th Cir. 1975), there is no indication on the record that *any* objection to the sale had been made, and therefore Danko and Skinner should be held conclusively bound by the sale order since they made no direct attack on the bankruptcy court's order and any consideration

proceeding listed on Schedule V annexed hereto (the Receivables subject to litigation listed on Schedule V being referred to hereinbelow as "Adjustment Accounts"), or (B) there has been, at any time during the two year period ending on the Second Anniversary Date, a judicial determination that any Adjustment Accounts are uncollectible by virtue of the conduct of the Bankrupt, and (ii) a written claim (the "Adjustment Claim") based on such written notice, for an adjustment of the Purchase Price pursuant to this Paragraph 1.8 (which Adjustment Claim shall specify the balance on the Second Anniversary Date of the Adjustment Accounts in respect of which such Adjustment Claim is made), an adjustment of the Purchase Price shall be made in accordance with Paragraphs 1.8(a) and (e) of this Agreement.

(d) The total amount of such adjustment of the Purchase Price shall be determined as follows:

(i) To the extent that the Adjustment Claim relates to Adjustment Accounts that are coupon accounts, the sole adjustment shall be determined by multiplying the aggregate balance on the Second Anniversary Date in Coupon Adjustment Accounts subject to such injunction or determination by $33\frac{1}{3}\%$, *provided, however,* that the aggregate adjustment in respect to coupon Adjustment Accounts shall in no event exceed $400,000.

(ii) To the extent that the Adjustment Claim relates to Adjustment Accounts that are revolving charge accounts, the sole adjustment shall be determined by multiplying the balance on the Second Anniversary Date in such revolving charge accounts, the sole adjustment shall be determined by multiplying the balance on the Second Anniversary Date in such revolving charge Adjustment Accounts subject to such injunction or determination by $33\frac{1}{3}\%$, *provided, however,* that the aggregate adjustment in respect of revolving charge Adjustment Accounts shall in no event exceed $600,000.

(iii) That maximum aggregate adjustment of the Purchase Price shall in no event exceed $1,000,000.

(e) The Purchase Price adjustment determined pursuant to Paragraph 1.8(d) hereof shall be payable as follows:

(i) If the Trustee agrees with the Adjustment Claim, he shall remit to the Purchaser the amount claimed, and need no longer maintain the balance in a separate account, being free to withdraw and use the same free of any restrictions imposed by this Agreement.

(ii) If the Trustee does not agree with the Adjustment Claim, the Adjustment Claim shall promptly be submitted to the Court referred to hereinbelow for resolution at a hearing upon notice to the Purchaser. Following a final determination thereof, the Trustee shall promptly remit to the Purchaser the amount, if any, of the adjustment so determined to be payable to the Purchaser, and need no longer maintain the balance in a separate account, being free of any restrictions imposed by this Agreement.

(f) The Trustee shall have the right, but shall have no obligation to the Purchaser, to defend or continue the defense of any litigation referred to on Schedule V annexed hereto. If the Trustee, in his sole discretion, determines to defend or continue the defense of any such litigation, such defense shall be at his sole cost and expense.

(g) No adjustment of the Purchase Price shall be made except pursuant to the provisions of Paragraphs 1.8(a) through (f) of this Agreement.

Thus, it is clear that although the Purchase Agreement made provision for a limited adjustment of the Purchase Price, particularly with respect to the coupon accounts, in the event that they were uncollectible in part, this provision for adjustment of purchase price did not create an independent right for the customers of those accounts to assert their claims against the purchaser of those accounts the defenses that they may have had against Grant for its *past* violations. This provision was in the nature of insurance for the purchaser in the event, that a court were to deem a portion of the accounts uncollectible.

of the order by this court would be a reprobated collateral attack.

Since this Court has considered matters outside of the pleadings, this motion shall be treated as and has been converted to a motion for summary judgment under Rule 56(c), Fed.R.Civ.P. *Arrington v. City of Fairfield, Ala.,* 414 F.2d 687 (5th Cir. 1969); *Herron v. Herron,* 255 F.2d 589 (5th Cir. 1958).

For the reasons stated above,

IT IS ORDERED that Federal Financial Corporation's motion to dismiss for failure to state a claim under Rule 12(b)(6), or in the alternative, for summary judgment under Rule 56, be and it is hereby GRANTED.

IT IS FURTHER ORDERED that judgment be entered in favor of defendant, Federal Financial Corporation, and against plaintiff, Alvin Skinner, and all others similarly situated, dismissing their claims in their entirety, and with each party to bear its own costs.

IT IS FURTHER ORDERED that judgment be entered in favor of defendant, Federal Financial Corporation, and against plaintiff, Laurence A. Danko, dismissing his claim in its entirety, and with each party to bear its own costs.

## ON MOTION FOR RULE 54(b) CERTIFICATION

This matter came before the Court for hearing on July 11, 1979 on the motion of Federal Financial Corporation ("FFC") to amend the judgment and for Rule 54(b) certification that there is no just reason to delay an appeal, and plaintiffs' opposition memorandum. Following the hearing, the Court indicated that it granted FFC's motion (1) to modify the judgment entered in *Alvin Skinner and all others similarly situated v. W. T. Grant Company,* C.A. No. 73–3257 (E.D.La. Apr. 9, 1979) to remove from the judgment to words "and all others similarly situated," and (2) to determine expressly as to both cases that Rule 54(b) certificate is warranted. The Court assigns the following reasons for its granting of FFC's motion based on the oral and written

arguments of counsel of the record and the applicable law: To the extent that the following conclusions of law constitute findings of fact, they are so adopted and to the extent that any of the conclusions of law constitute findings of fact they are so adopted.

## FINDINGS OF FACT

In the Court's Order and Reasons for Rulings of April 4, 1979 and the Judgment of April 9, 1979 entered in *Skinner v. W. T. Grant Co., supra,* the phrase "and all others similarly situated" was listed in the dismissal of plaintiffs' suit against FFC. The alleged class in Skinner has not been certified; therefore, any judgment purporting to have an effect on a putative class is inappropriate and should therefore be amended to remove the reference to "and all others similarly situated." These consolidated cases involve multiple parties, i. e., plaintiffs Skinner and Danko, and defendants Grant and FFC, and multiple claims, i. e., allegations of violations of the Truth-in-Lending Act, 15 U.S.C. § 1601 *et seq.* and Louisiana usury law, La.Civ.Code art. 2924. On April 4, 1979, this Court directed entry of a final judgment, entered on April 9, 1979, as to one (FFC) but fewer than all parties (Grant remains a defendant). The relationship between the adjudicated and the unadjudicated claims is such that the determination of FFC's non-liability as an involuntary assignee pursuant to order of the Grant bankruptcy court is in no way dependent upon the liability or non-liability of Grant. Thus, appellant review of the April 4, 1979 Order will not create a significant danger of multiple review of the same transaction. The Court is aware of no developments in the near future that will moot the need for appellate review. FFC has made no counterclaim in these proceedings. Delay in appellate review, however, may force FFC to continue to participate in all subsequent proceedings, subjecting it to substantial needless expense.

## CONCLUSIONS OF LAW

Since the determination necessary to affect finality under Rule 54(b) had not been

made with respect to the Judgment of April 9, 1979 entered in these consolidated actions, this Court retains the discretion to permit amendment and may exercise its discretion pursuant to an appropriate motion for leave to amend. *Cassell v. Michaux,* 99 U.S.App.D.C. 375, 240 F.2d 406 (D.C.Cir. 1956); *United States v. Desert Gold Min. Co.,* 433 F.2d 713 (9th Cir. 1970); *Shawe v. Wendy Wilson, Inc.,* 25 F.R.D. 1 (S.D.N.Y.1960). Where, as here, the Court has granted a summary judgment in favor of one, but fewer than all of the parties, which fully disposes of its interest in the action, the trial court may then make a judgment final and appealable under F.R.C.P. 54(b) even though the action remains pending as to other parties. *Keller v. Dravo,* 441 F.2d 1239 (5th Cir. 1971). Having weighed the relationship between the adjudicated and unadjudicated claims, *see, Cold Metal Process Co. v. United Engineering & Foundry Co.,* 351 U.S. 445, 452, 76 S.Ct. 904, 100 L.Ed. 1311 (1956), the Court finds that an appellate review of its April 4, 1979 Order would not cause a significant danger of multiple review of the same transaction, and it is unlikely that developments in the near future will moot the need for appellate review of the present decision. There is no counterclaim by FFC which would result in set-off against the judgment sought to be made final, *see TPO, Inc. v. F. D. I. C.,* 487 F.2d 131, 134 (3d Cir. 1973), and delay of appellate review could cause unnecessary hardship and expense, *see Campbell v. Westmoreland Farm, Inc.,* 403 F.2d 939, 942 (2d Cir. 1968). Thus, the Court finds no just reason for delaying final and appealable judgment when the failure to do so may adversely and harshly affect FFC, *see, e. g., Ryan v. Occidental Petroleum Corp.,* 577 F.2d 298, 301 (5th Cir. 1978).

For the reasons stated above,

IT IS ORDERED that Federal Financial Corporation's motion to amend the Judgment and for Rule 54(b) certification be and it is hereby GRANTED.

IT IS FURTHER ORDERED that the judgment of April 9, 1979 in *Skinner v. W. T. Grant Co.,* C.A. No. 73–3257, be and it is hereby *AMENDED* to delete reference "and all others similarly situated".

IT IS FURTHER ORDERED that the judgment of April 9, 1979, be and it is hereby AMENDED to direct judgment under Rule 54(b), there being no just reason for delaying a final and appealable judgment as to these actions.